754 A.2d 666

**LTV STEEL COMPANY, INC., Appellant,**

**v.**

**WORKERS' COMPENSATION APPEAL BOARD (MOZENA), Appellees.**

**USX Corporation, Appellant,**

**v.**

**Workers' Compensation Appeal Board (Rich), Appellees.**

Supreme Court of Pennsylvania.

Argued March 7, 2000.

Decided July 19, 2000.

208

Michael A. Cohen, Christopher L. Wildfire, Pittsburgh, for appellant, LTV Steel Co., Inc.

David A. Luptak, Marie Jurbala Shiring, Pittsburgh, for appellant, USX Corp.

James D. Strader, Ralph J. Saunders, Pittsburgh, for amici, Camp Hill Corp. and Armco.

Daniel K. Bricmont, Pittsburgh, for appellees, Mozena and Donald Rich.

David Hawkins, Secretary, Pittsburgh, James A. Holzman, Harrisburg, Amber M. Kenger, Mechanicburg, for appellee, W.C.A.B.

Before FLAHERTY, C.J., ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN, SAYLOR, JJ.

## *OPINION*

NEWMAN, Justice.

These are consolidated cases involving appeals by two employers from awards of workers' compensation benefits to their respective employees. LTV Steel Company, Inc. (LTV) appeals from the Order of the Commonwealth Court, which affirmed an Order of the Workers' Compensation Appeal Board (Board), affirming an award of hearing loss benefits by a Workers' Compensation Judge (WCJ) to employee John Mozena (Mozena). USX Corporation (USX) appeals from the Order of the Commonwealth Court, which affirmed an Order by the Board, affirming an award of hearing loss benefits by a WCJ to Donald Rich (Rich), an employee of USX.

## FACTS AND PROCEDURAL HISTORY

*LTV Steel Company, Inc. v. W.C.A.B. (Mozena)*

From 1957 to the present, Mozena has worked at the same steel plant in Aliquippa. He began his employment as a laborer with Jones & Laughlin Steel Corporation (J & L) and advanced to millwright. By 1974, LTV Corporation, a Dallas-based holding company, had acquired 100% of the stock of J & L, at which time LTV merged J & L into its operations, making J & L a wholly owned subsidiary of LTV. LTV

acquired Youngstown Sheet and Tube Steel Company (Youngstown) in 1978 and merged it with J & L in 1981. In 1981, LTV purchased Republic Steel (Republic) and merged it with J & L, amassing all assets in the present name of LTV Steel Company.

On August 21, 1995, Mozena filed a Claim Petition for Workers' Compensation benefits, alleging that, in the course of his employment, he suffered a bilateral hearing loss from his long-term exposure to occupational noise at the Aliquippa plant. At the claim petition hearing before a WCJ, he specifically claimed that loud, continuous noise from heavy machinery, metal impacts, and furnace blasts caused his hearing loss. He denied having any exposure to nonoccupational hazardous noise. He also testified that he wore earplugs from the day he began work with J & L. The WCJ found the testimony of Mozena to be credible. Mozena also presented the deposition testimony of Michael Bell, M.D., board certified in otolaryngology,[1] who opined about the extent of Mozena's hearing loss. The results of audiometric testing[2] led Dr. Bell to conclude that Mozena had suffered a binaural hearing loss of 26.56% from work-related causes. Dr. Bell based his finding on the American Medical Association's Guides to the Evaluation of Permanent Impairment, 4th Edition (June 1993) (AMA Guides),[3] as required by Section 306(c)(8)(i) of the Workers'

---

**1.** "Otolaryngology" is "[t]he combined specialties of diseases of the ear and larynx, often including upper respiratory tract and many diseases of the head and neck, tracheobronchial tree, and esophagus." STEDMAN'S MEDICAL DICTIONARY 1272 (26th ed.1995).

Otolaryngologists are physicians trained in the medical and surgical management and treatment of patients with diseases and disorders of the ear, nose, throat, and related structures of the head and neck. THE AMERICAN MEDICAL ASSOCIATION ENCYCLOPEDIA OF MEDICINE 758 (Charles, B. Clayman ed.,1989).

**2.** Audiometric testing must be available to all employees who have average exposure levels of 85 decibels or higher eight or more hours per day. 29 C.F.R.1910.95(g) (federal occupational noise exposure regulation promulgated by the Occupational Safety and Health Administration).

**3.** Chapter 9 of the AMA Guides provides the "criteria for use in evaluating permanent impairments resulting from the principal dys-

Compensation Act (Act) to calculate hearing loss.[4]

At the hearing, LTV introduced the deposition testimony of its own medical expert, Sidney Busis, M.D., a board certified otolaryngologist. Dr. Busis also conducted an audiogram [5] on Mozena and concluded that he suffered a binaural hearing loss of 23.4%. However, Dr. Busis ascribed 8.11% of Mozena's

> functions of the ear, nose, throat, and related structures." The AMA Guides do not discuss age related hearing loss.

4. Act of June 2, 1915, P.L. 736, added by Act of February 22, 1995, P.L. 1, *as amended*, 77 P.S. § 513(8)(i). Section 306(c)(8)(i) provides, in relevant part, the following:

> For permanent loss of hearing which is medically established as an occupational hearing loss caused by long-term exposure to hazardous occupational noise, the percentage of impairment shall be calculated by using the binaural formula provided in the Impairment Guides. Section 105.5 of the Act defines "Impairment Guides," as meaning "the American Medical Association's Guides to the Evaluation of Permanent Impairment, Fourth Edition (June 1993)." 77 P.S. § 25.5.

5. The basic hearing test, or audiogram, uses controlled auditory stimulus to measure the level of detection in a patient. 1 OTOLARYNGOLOGY 256 (Michael M. Paparella, M.D., et al. eds, 3 rd ed.1991). A trained audiologist administers an audiogram to the patient. OTORHINOLARYNGOLGY: HEAD AND NECK SURGERY 971 (John Jacob Ballenger & James B. Snow, Jr., eds., 15 th ed.1996). A complete audiogram will test both the bone conduction (the ability to hear a sound when it transmitted through bone) and the air conduction (the ability to hear a sound when it is transmitted through air). DEWESSE AND SAUNDERS' OTOLARYNGOLOGY—HEAD AND NECK SURGERY 380–81 (David E. Schuller, M.D. & Alexander J. Schleuning, III, M.D. eds., 8 th ed.1994). A comparison between these two types of conduction can be very useful in localizing which part of the hearing mechanism is responsible for the loss. OTORHINOLARYNGOLGY, *supra*, at 953–56. In particular, the test is useful in determining if the loss is due to a problems with the portion of the middle ear that conducts sound from the ear canal to the inner ear (in which case it would be called a "conductive" hearing loss) or if it is due to the inner ear or the nerve that conducts the sound signals to the brain (in which case it would be called a "sensorineural" hearing loss). *Id.*

> The results of audiograms are most often displayed in graph form. *Id.* This graph shows the amount of hearing loss expressed in units called decibels at different sound frequencies (also called hertz). *Id.* High frequencies correspond to high tones, and low frequencies are low tones. *Id.* Most audiograms test frequencies from 250 hertz to 8,000 hertz. *Id.* at 953; DEWESSE AND SAUNDERS', *supra*, at 380. A loss of up to 30 decibels on this graph is considered "normal." DEWESSE AND SAUNDERS', *supra*, at 377. Hearing losses over 30 decibels are considered abnormal. *Id.*

hearing loss to the aging process, referred to as presbycusis.[6] Dr. Busis determined that he could attribute only 15.31%. of the hearing loss to other causes, such as work-related factors. To obtain the percentage that he claimed was caused by presbycusis, Dr. Busis relied on the International Standard 1999 of the International Organization for Standardization[7] (ISO 1999).[8]

LTV introduced the deposition transcript of a second witness, attorney Mark Katz, to prove that LTV was not Mozena's employer for all relevant years. Mr. Katz is a senior attorney for LTV, who is familiar with the corporate structure and history of LTV. Through the testimony of Mr. Katz, LTV intended to show that from 1957 to 1973 Mozena worked for J

6. The term "presbycusis" is derived from the two Greek words— *"presbus"* meaning "old man" and *"acusis"* meaning "hearing." *See* OTOLARYNGOLOGY, *supra* note 5, at 1629. Presbycusis is a form of hearing loss due to wear and tear or deterioration within the ear. DEWESSE AND SAUNDERS', *supra* note 5, at 455–56. Generally speaking, it is part of the natural aging process, but the etiology remains uncertain. OTORHINOLARYNGOLGY, *supra* note 5, at 1133; OTOLARYNGOLOGY, *supra* note 5, at 1636. Etiological factors may include genetics, metabolism, nutrition, climate, and exposure to noise. OTOLARYNGOLOGY, *supra* note 5, at 1636 The symptoms manifest themselves gradually and progressively and are similar to those associated with occupational or noise-induced hearing loss. DEWESSE AND SAUNDERS', *supra* note 5, at 457. Most laboratory and filed studies indicate that hearing loss caused by noise, such as occupational sounds, are additive (in decibels) with the impairment attributed to presbycusis. OTORHINOLARYNGOLGY, *supra* note 5, at 1134. *But see* TEXTBOOK OF GERIATRIC MEDICINE AND GERONTOLGY 489 (J.C. Brocklehurst, M.D., ed., 3 rd ed.1985) (stating that opinions vary concerning corrections for age-related hearing loss). Presbycusis is the most common example of hearing impairment in the United States. OTOLARYNGOLOGY, *supra* note 5, at 1629.

7. The International Organization for Standardization (ISO) is an international federation of national standards bodies from approximately 130 countries. ENCYCLOPEDIA OF ASSOCIATIONS: INTERNATIONAL ORGANIZATIONS 6139 (Tara E. Sheets ed., 35 th ed.2000). Founded in 1947, the ISO is a non-governmental organization with the mission of promoting the development of industrial standardization and related activities to advance global exchange of goods and services and international technical, scientific, and economic cooperation. *Id.*

8. The ISO 1999 provides a table that attributes levels of hearing loss at each frequency to different ages of populations. Deposition of Dr. Sidney Busis, Sept. 10, 1996, at 18 (LTV's R.R. 52).

& L and, thus, LTV was not liable for any pre–1974 injury, which Mozena had not already claimed. However, Mr. Katz conceded that, through stock sales, which resulted in the total purchase of J & L in 1974, LTV assumed all assets and liabilities of J & L, including all workers' compensation claims existing prior to 1974.

The WCJ found the medical expert for Mozena, Dr. Bell, more credible than Dr. Busis and ascertained that Mozena suffered a 26.56% hearing loss caused by long-term exposure to hazardous occupational noise. *LTV received no credit for any age-related hearing loss.* The WCJ also concluded that Mozena had worked for LTV from 1957 to the present because LTV had assumed the liabilities of all its constituent companies through merger. Based on the formula set forth in Section 306(8)(i) of the Act, the WCJ awarded Mozena a benefit of $509.00 per week for 68.9 weeks, plus costs and attorney's fees.[9] *See* 77 P.S. § 513(8)(i).

LTV appealed to the Board raising several claims, including various allegations of error of law and insufficiency of evidence. The Board affirmed the decision of the WCJ and stated that the findings of the WCJ were supported by substantial, competent evidence and that the judge committed no errors of law.

LTV filed a timely appeal to the Commonwealth Court, raising four issues:[10] (1) it claimed that the WCJ erred by finding it liable for any of Mozena's hearing loss that occurred before 1974; (2) LTV claimed the WCJ erred by not allowing its expert to provide testimony concerning the effect of aging

9. Section 306(8)(i) provides, in relevant part, the following:

The number of weeks for which compensation shall be payable shall be determined by multiplying the percentage of binaural hearing impairment as calculated under the Impairment Guides by two hundred sixty weeks. Compensation payable shall be sixty-six and two-thirds per centum of wages during this number of weeks, subject to the provisions of clause (1) of subsection (a) of this section. 77 P.S. § 513(8)(i).

10. Because LTV raises only the first two issues in its present appeal, regarding the effect of age on hearing loss and the effect of its mergers on employer liability, we limit our discussion to those issues.

on hearing loss;[11] (3) it reiterated a procedural claim it raised before the Board, notably, that because Mozena admitted that he knew of some hearing loss since 1988, the Act, 77 P.S. § 631, barred his claim petition for his failure to notify LTV within 120 days of the injury; and (4) it was reversible error for the WCJ to render a decision without ascertaining a specific date of injury.

The Commonwealth Court affirmed the Order of the Board. *LTV Steel, Inc. v. W.C.A.B. (Mozena)*, 727 A.2d 160 (Pa. Cmwlth.1999). Relying largely on its decision in *USX Corp. v. W.C.A.B. (Rich)*, 727 A.2d 165 (Pa.Cmwlth.1999), the Commonwealth Court held that the AMA Guides did not allow a reduction in benefits for hearing loss caused by the aging process. Also, finding substantial evidence that LTV, as successor-in-interest to J & L, had assumed all liability for the hearing loss of Mozena since he began working at the Aliquippa plant in 1957, the Commonwealth Court rejected LTV's second assertion that it was only responsible for injuries occurring after 1973.

### *USX Corporation v. W.C.A.B. (Rich)*

Rich began his employment with USX in 1953 as a laborer in various positions at USX's Edgar Thompson steel manufacturing operations. In 1971, he began working as a crane operator at the blast furnace. On August 9, 1995, Rich filed a Claim Petition for workers' compensation benefits against

---

**11.** Although LTV repeats its claim to this Court that the decision of the WCJ, as affirmed by the Board and the Commonwealth Court, prevents employers from presenting evidence of nonoccupational causes of hearing loss, we find no merit to its accusation. The record demonstrates that the WCJ allowed LTV to explore a variety of potential nonoccupational causes of hearing loss, including the aging process. *See* Deposition of Dr. Busis, 8–10, 12, 16–19, 29–30 (LTV's R.R. 42–44, 46, 50–53, 63–64). Counsel for LTV testified at length concerning the use of the tables provided in the ISO 1999 to determine percentages of hearing loss due to presbycusis. *Id.* at 16–19 (R.R. 50–53). The WCJ explicitly overruled an objection by Mozena's counsel alleging that evidence of the ISO 1999 was irrelevant to the issue of causation. Notwithstanding the conclusion by the WCJ that LTV's presbycusis evidence was relevant to prove causation, it found more credible the testimony of Dr. Bell, who implicated occupational noise as the cause of the disability.

USX, claiming that, as a result of his long-term exposure to occupational noise at the steel mill, he suffered a bilateral hearing loss. At a hearing before the WCJ, Rich testified that, during his work as a crane operator, he encountered loud noises from sirens, horns, steam pipes, and heavy machinery. Rich also stated that USX had not provided earplugs until 1990. Rich acknowledged that his nonoccupational activities and pre-USX employment in the U.S. Army exposed him to loud noises. The WCJ concluded that Rich's military service did not adversely affect his hearing.

The WCJ received the deposition testimony of Roger L. Duerksen, M.D., a board-certified otolaryngologist, who testified for Rich. Dr. Duerksen conducted an audiogram of Rich and determined that he had suffered a 30% binaural hearing loss according to the AMA Guides. Dr. Duerksen attributed the entire hearing loss to Rich's long-term exposure to noise at USX. A medical expert hired by USX, Douglas Chen, M.D., presented different results. Dr. Chen, also board certified in otolaryngology, testified in his deposition that an examination of Rich revealed a 20.5% hearing loss, pursuant to the AMA Guides. Dr. Chen attributed 6.8% of his hearing loss to presbycusis and 13.7% of the hearing loss to occupational noise. While recognizing that the AMA Guides make no provision for age-related hearing loss, Dr. Chen relied on ISO 1999 to reach his conclusion.

A second witness, James Quealy testified for USX about the level of noise at the steel mill. USX employed Mr. Quealy as an industrial hygienist and environmental health and safety manager. The WCJ discounted Mr. Quealy's testimony about two noise surveys taken at the facility because he failed to demonstrate personal knowledge of the tests. Thus, the WCJ ruled that it could not accept as competent evidence his opinion about the normal working conditions at the Edgar Thompson Works.

The WCJ found USX's medical expert, Dr. Chen, more credible than Rich's expert with regard to his level of impairment and concluded that Rich suffered a 20.5% loss of hearing

from long-term exposure to hazardous, occupational noise. *However, the WCJ rejected Dr. Chen's assertion that there should be any reduction for the natural aging process.* The WCJ sustained objections by Rich's counsel, contesting the relevancy of the evidence pertaining to presbycusis. Because Act 1 expressly provides for use of the AMA Guides to determine degree of hearing impairment, without mentioning any other standards; the AMA Guides do not discuss or apply any methodology to factor aging into hearing loss calculations; and the ISO 1999 employs a general statistical formula based only on the age of individuals, the WCJ ruled that it could not consider the effects of presbycusis when evaluating claims of work-related hearing loss. Furthermore, the WCJ noted that Dr. Chen admitted that long-term industrial exposure was the most important cause of Rich's hearing loss. Applying the statutory formula for compensation for occupational hearing loss, the WCJ awarded a benefit of $509.00 per week for 53.3 weeks plus costs and attorney's fees to Rich.

USX appealed to the Board, which affirmed, finding support by substantial, competent evidence and finding no error of law. From the denial of appeal by the Board, USX appealed to the Commonwealth Court. In *USX Corp. v. W.C.A.B. (Rich)*, 727 A.2d 165 (Pa.Cmwlth.1999), the Commonwealth Court affirmed the Order of the Board. USX presented one issue to the Commonwealth Court: whether the WCJ erred, as a matter of law, in excluding evidence of hearing loss caused by the aging process. Principal among its assertions, USX argued that Section 306(c)(8)(vi) allows a reduction in liability for hearing loss for any portion that is attributable to nonoccupational causes, including presbycusis. Section 306(c)(8)(vi) provides the following:

An employer shall be liable only for the hearing impairment caused by such employer. If previous occupational hearing impairment or hearing impairment from nonoccupational causes is established at or prior to the time of employment, the employer shall not be liable for the hearing impairment

so established whether or not compensation has previously been paid or awarded.

77 P.S. § 513(8)(vi).

Performing a statutory interpretation of Section 306(c)(8)(vi), the Causation Section of Act 1, the Commonwealth Court reasoned that the legislature never authorized a blanket reduction from a calculation of hearing impairment for every nonoccupational factor. It concluded that the legislature did not intend to "vitiate the normal principle that an employer is responsible for a disability caused by a combination of work-related and [nonwork-related] factors if the work-related factors were a substantial contributing factor to the injury even though a claimant may have been more susceptible to that type of injury because of his age or preexisting condition." *USX Corp.*, 727 A.2d at 166. It stated that the phrase "at or prior to the time of employment" in Section 306(c)(8)(vi) merely demonstrates the legislature's intent to eliminate the application of the "last injurious exposure rule" in situations where two or more employers were responsible for an employee's hearing impairment. The Commonwealth Court conveyed that prior to Act 1, the last employer who employed an employee, who suffered any work-related injury, including loss of hearing could be liable for the total work-related injury. The Commonwealth Court has explained that the purpose of applying the "last injurious exposure rule" to hearing loss disabilities was to assure compensation for an injury that usually occurs progressively and stems from cumulative exposure to occupational noise. *See Sellari v. W.C.A.B. (NGK Metals)*, 698 A.2d 1372, 1375 (Pa.Cmwlth.1997); *Pittsburgh Press Co. v. W.C.A.B. (Taress)*, 143 Pa.Cmwlth. 609, 600 A.2d 626, 630 (1991).

The Commonwealth Court also found that Act 1 lowered a claimant's burden of proof to demonstrate the extent of his hearing loss to receive benefits. Notably, pre-Act 1 Section 306(c)(8) required a claimant to demonstrate, for all practical intents and purposes, complete occupation-caused hearing

loss.[12] *See W.C.A.B. v. Hartlieb*, 465 Pa. 249, 348 A.2d 746, 748 (1975); *Aristech Chemical Corp. v. W.C.A.B. (Keefer)*, 664 A.2d 686, 687–88 (Pa.Cmwlth.1995), *alloc. denied*, 543 Pa. 731, 673 A.2d 337 (1996). With the adoption of Act 1, an employer became liable for the specific percentage of hearing loss caused by its work environment. 77 P.S. § 513(8)(i); *see Bible v. Commonwealth, Dept. of Labor and Industry*, 548 Pa. 247, 696 A.2d 1149, 1151 (1997); *cf. NGK Metals Corp. v. W.C.A.B. (Anastasio)*, 713 A.2d 123, 126 (Pa.Cmwlth.1998). With the inclusion of Section 306(c)(8)(vi), an employer could escape partial or total liability, if it can prove, at or prior to the time of employment, that (1) a previous employer, or (2) a nonoccupational factor, caused some or all of the hearing loss.

To support its position that the legislature did not intend to provide a reduction for presbycusis, the Commonwealth Court pointed to the plain language of Act 1 and the legislative history of the 1995 Amendments. The Commonwealth Court determined that the legislature was keenly aware of the potential effect of aging on hearing but, rather than providing for a age-related reduction, it restricted calculations to standards located in the AMA Guides and included a broad-based threshold requiring proof by all claimants of more than a 10% hearing loss before they may receive workers' compensation benefits. *See* 77 P.S. § 513(8)(iii).[13] In summary, the Com-

12. The pre-Act 1 Section 306(c)(8) required the following proof of fact to obtain benefits:

> For the complete loss of hearing, in both ears, sixty-six and two-thirds per centum of wages during two hundred sixty weeks; for complete loss of hearing in one ear, sixty-six and two-thirds per centum of wages during sixty weeks.

77 P.S. § 513(8) (amended by Act 1 of 1995).

13. With regard to minimum proof for benefits for hearing loss and presumption of total loss of hearing, Section 306(c)(8)(iii) provides the following:

> Notwithstanding the provisions of subclauses (i) and (ii) of this clause, if there is a level of binaural hearing impairment as calculated under the Impairment Guides which is *equal to or less than ten per centum*, no benefits shall be payable. Notwithstanding the provisions of subclauses (i) and (ii) of this clause, if there is a level of binaural hearing impairment as calculated under the Impairment Guides which is equal to or more than seventy-five per centum, there shall be

monwealth Court held that, although an employer is generally free to introduce evidence of nonoccupational causes of hearing loss, natural aging based on the ISO 1999 is not a permissible factor for reducing an employer's liability.

## DISCUSSION

At issue in these two appeals is, first, whether Act 1 of 1995 permits deduction from a claimant's total binaural hearing impairment that portion of the impairment caused by presbycusis. Second, we granted allocatur from LTV's Petition for Allowance of Appeal to explain whether mergers, acquisitions, or other changes in corporate structure constitute the creation of a new employer for determining the amount of hearing loss caused by an employer.

 Appellate review of matters arising under the Workers' Compensation Act is limited to discerning whether there was an error of law or a violation of constitutional rights, or whether there was substantial evidence to support the necessary findings of fact. 2 Pa.C.S. § 704; *Sporio v. W.C.A.B. (Songer Construction),* 553 Pa. 44, 717 A.2d 525, 528 (1998). Because this appeal raises a question of law, our scope of review is plenary. *Phillips v. A–Best Products Co.,* 542 Pa. 124, 665 A.2d 1167, 1170 (1995).

### *Presbycusis Not Recognized by Act 1*

Appellants claim that the Commonwealth Court erred as a matter of law in its interpretation of the Causation Section of Act 1. They argue that Section 306(c)(8)(vi) clearly provides for a reduction in liability for hearing loss caused by all nonoccupational factors. Because there is no express exception for presbycusis, it is illegal to exclude that factor as nonoccupational cause of hearing loss.

 Where the intent of the legislature is clear from the plain meaning of a statute, courts must not pursue statutory

a presumption that the hearing impairment is total and complete, and benefits shall be payable for two hundred sixty weeks.
77 P.S. § 513(8)(iii) (emphasis added).

construction. 1 Pa.C.S. § 1921(b); *Markle v. W.C.A.B. (Caterpillar Tractor Co.)*, 541 Pa. 148, 661 A.2d 1355, 1360 (1995). However, where the intent of legislature is uncertain, statutory construction becomes essential. 1 Pa.C.S. § 1921(c); *McClellan v. Health Maintenance Organization of Pennsylvania*, 546 Pa. 463, 686 A.2d 801, 805 (1996). To ascertain the meaning of ambiguous statutory language, courts should look beyond the language and consider a variety of factors, including: the occasion and necessity for the statute; the circumstances under which the legislature enacted it; the mischief to be remedied; the object to be obtained; the former law, if any, including other statutes on the same or similar subjects; the consequence of a particular interpretation; the contemporaneous legislative history; and, when available, legislative and administrative interpretations of the statute. 1 Pa.C.S. § 1921(c); *DeLellis v. Borough of Verona*, 541 Pa. 3, 660 A.2d 25, 28–29 (1995).

We cannot agree with Appellants that the Causation Section provides a clear picture of the legislature's intent. The Commonwealth Court astutely acknowledged the conflict created by Appellants' position. The Act is remedial in nature, and its purpose is to provide quick and certain benefits to employees of the Commonwealth who suffer from work-related injuries. *Sporio*, 717 A.2d at 528; *Martin v. W.C.A.B. (Emmaus Bakery)*, 539 Pa. 442, 652 A.2d 1301, 1303 (1995). Courts should liberally construe the Act in favor of the claimant to effectuate its humanitarian objectives. 1 Pa.C.S. § 1922(5); *Gardner v. Erie Insurance Company*, 555 Pa. 59, 722 A.2d 1041, 1047 (1999); *Harper & Collins v. W.C.A.B. (Brown)*, 543 Pa. 484, 672 A.2d 1319, 1321 (1996). Accordingly, in its opinion in *USX Corp., supra*, the Commonwealth Court understood that if the Causation Section were to allow a reduction for presbycusis based on general, statistical formulas, employees may be left uncompensated for a work-related injury.

Because hearing loss from occupational noise is progressive and can develop over many years of exposure, it is difficult to establish a precise moment when hearing impairment occurs.

*Boeing Helicopter Company v. W.C.A.B. (McCanney)*, 157 Pa.Cmwlth. 76, 629 A.2d 184, 187 (1993). The Commonwealth Court expressed its concern in permitting employers to avoid payment of benefits when it cannot isolate the effects of aging. We share this apprehension. Courts must have reliable means for distinguishing the effects of presbycusis from the effects of long-term exposure to occupational noise. Neither LTV nor USX has shown how the Act can both accomplish its humanitarian objective and permit a reduction in liability based on indiscriminate information.

To resolve this conflict, we must understand the entire section, as a whole, rather than focusing on one sentence. 1 Pa.C.S. § 1922(2). The Commonwealth Court analyzed the purpose of the Causation Section, the operation of Act I and its predecessor provision, and the legislative history of Act 1. We find the analysis by the Commonwealth Court of Act 1, particularly concerning the legislative history, well-reasoned and compelling.

We quote the following discussion by the Commonwealth Court about the legislative history of Act 1:

[Section 306(c)(8)(iii) ] as passed in its present form was a result of Amendment No. A0380 to House Bill 3 (upon passage by House and Senate and signed by the Governor into law as Act 1) to a previous version of the bill that would have allowed a deduction from hearing loss as a result of aging. The sponsor of the amendment, Representative [William R.] Lloyd, [Jr.] stated that it would have the following effect:

Essentially [the amendment] does three things. Number one, it removes from the bill the provision which says that once you reach age 40, that any claim thereafter, you deduct half a percent a year from whatever the hearing loss test shows. Number two, it says that there is no hearing loss benefit paid unless you pass a threshold of at least 10–percent hearing loss. Number three, it says that if your hearing loss is in excess of 75 percent according to the test, you are entitled or the presumption is that you get 100–percent benefit.

Legislative Journal–House, No. 9, January 30, 1995, p. 320. Representative Lloyd's statement and, more importantly, the amendment taking out the aging requirement, establishes that the General Assembly initially considered an age-related deduction, but rejected that proposal by amending HB. 3 to eliminate that requirement and instead place a minimum threshold of a 10% level of hearing loss before a claimant would be eligible for benefits. The consideration of the history of Section 306(c)(8)(iii) and the fact that the plain language of Act 1 does not allow for an age-related deduction indicates that the General Assembly did not intend to allow an age-related deduction from the total percentage of hearing impairment. Because the General Assembly knew how to provide for a deduction for normal aging and did not, and the legislature specifically provided that the AMA Guidelines were to be used, we can only conclude that the General Assembly intended to exclude ISO 1999 as a standard of measurement, even if it allowed an age-reduction. Just as in a case where an employee suffers a back injury, absent a clear expression from the General Assembly, we would not terminate or suspend benefits simply because a claimant could have returned to work in half the time but for the normal wear and tear of life as a result of aging. We similarly will not do so here. *USX Corp.*, 727 A.2d at 168 (footnotes omitted).

■ Appellants argue that the legislative history of Act 1 is not dispositive of the General Assembly's intent to prevent consideration by a tribunal of presbycusis. Where the legislature has considered a particular issue but failed to address it in the enacted legislation, the plain language must control. *See Armco Inc. v. W.C.A.B. (Mattern)*, 542 Pa. 364, 667 A.2d 710, 714 (1995); *Martin v. Soblotney*, 502 Pa. 418, 466 A.2d 1022, 1025 n. 5 (1983); *Com. v. Alcoa Properties, Inc.*, 440 Pa. 42, 269 A.2d 748, 749 (1970). Here, the legislature recognized the effect of aging but did not address it in any express manner. Appellants aver that the consideration by the legislature of an annual one-half percent deduction starting at age forty merely indicates an awareness by the legislature of

presbycusis, not an overt rejection of it as a nonoccupational cause of hearing loss. Act 1 does not mention any nonoccupational factor by name. They argue that had the General Assembly sought to exclude presbycusis it would have done so explicitly.

■ Appellants' logic defies the time-honored maxim of statutory interpretation, "expressio unius est exclusio alterius." [14] The only standard provided by the legislature in Act 1 is the AMA Guides. There is no mention of ISO 1999 in Act 1. We find it useful in interpreting the intent of the legislature that it considered age as a factor but, ultimately, provided no method for assessing its effect. We also recognize that presbycusis is distinguishable from other nonoccupational factors. There is no reliable scientific (controlled) means of quantifying how aging impairs the hearing of a given individual. Whereas, the effect of many other nonoccupational factors is quantifiable. Courts have reduced an employer's responsibility for benefits where it established that a nonwork-related cause was the substantial contributing factor of hearing impairment. *See, e.g., Washington Steel Corp. v. W.C.A.B. (Waugh)*, 734 A.2d 81 (Pa.Cmwlth.1999) (hunting was primary cause of hearing loss). We find no merit to the contention by LTV that the decision by the Commonwealth Court precludes employers from presenting evidence of *all* nonoccupational causes. Where the nonoccupational causes of a specific individual's hearing impairment is quantifiable using the AMA Guides, either side may present evidence of the percentage of loss.

■ The WCJ must base its decision on substantial evidence. *Bethenergy Mines v. W.C.A.B.*, 132 Pa.Cmwlth. 288, 572 A.2d 843, 844–45 (1990). The WCJ is the ultimate finder of fact, and the exclusive arbiter of credibility and evidentiary weight. *Id.* Accordingly, the WCJ is free to accept or reject, in whole or in part, the testimony of any witness. *Jordan v. W.C.A.B. (Consol Elec. Distributors)*, 550 Pa. 232, 704 A.2d 1063, 1066 (1997); *Markle*, 661 A.2d at 1359.

**14.** "The expression of one thing is the exclusion of another." BLACK'S LAW DICTIONARY 581 (6 th ed.1990).

Unless otherwise directed by statute, a WCJ may dismiss an entire school of science, if the judge determines that it lacks credibility. In the present cases, one WCJ permitted the introduction of presbycusis, but found it incredible, and the other WCJ barred the presentation of presbycusis because USX failed to prove it with the AMA Guides. Because we find that the Act 1 does not provide for the use of ISO 1999 to establish aging as a cause of hearing impairment, and the WCJ in both claims petitions had substantial evidence to determine the percentage of hearing loss attributed to long-term exposure to hazardous occupational noise, we hold that the Commonwealth Court committed no error in affirming the decisions of the WCJ and the Board.

### Responsibility of Successor–in–Interest

LTV claims that, as the second employer of Mozena, it is not liable for any of Mozena's hearing loss that occurred before it merged with J & L in 1974. The basis for LTV's argument is that, by eliminating the "last injurious exposure rule" for hearing loss injuries, Section 306(c)(8)(vi) of Act 1 made each employer responsible for the specific percentage of hearing loss it caused. LTV's entire argument rests on two questionable premises: (1) it did not start to employ Mozena until 1974 and (2) Mozena sustained a substantial amount of his hearing loss before 1974.[15]

We agree with LTV and the Commonwealth Court that, for determining responsible parties for work-related hearing loss, Section 306(c)(8)(vi) has replaced the "last injurious exposure rule" with specific loss liability. Consequently, where there has been more than one employer, an employer may present evidence of the percentage of hearing impairment it caused to limit its responsibility for paying benefits. Section 306(c)(8)(vi) requires an employer to establish hearing impairment caused by a previous employer, or by nonoccupational factors, at or prior to the time of employment. This

15. LTV argues, alternatively, that it did not become Mozena's employer until 1984, when, it asserts, the incorporation of LTV Steel Company occurred and the name "J & L" was no longer in use.

also generates a baseline for the new employer to calculate any future hearing loss.

LTV had a full and fair opportunity to present evidence of its corporate history. A senior attorney, Mark Katz, testified about the mergers that culminated in the creation of LTV Steel Company. Finding Katz's testimony to be credible, the WCJ found that LTV Corporation completed its stock purchase of J & L by November of 1974. Katz testified that when LTV acquired J & L, LTV assumed all of the decision-making powers at the Aliquippa plant but continued to operate the facility under the J & L name, with the addition of the LTV name. In 1978, LTV acquired Youngstown. In 1981, LTV merged J & L with Youngstown, with J & L as the surviving company. In 1984, LTV purchased Republic and merged it into J & L, with Republic being the surviving entity. LTV then changed the name of Republic to LTV Steel Company. Katz conceded on cross-examination that, as the successor-in-interest of J & L, LTV assumed all of J & L's assets, as well as all of its liabilities, including workers' compensation claims existing at the time of the 1974 merger. LTV became responsible for paying all claims that arose before 1974. From Katz's testimony, the WCJ determined that LTV was the only employer responsible for the injuries suffered by Mozena.

It is well established law in the Commonwealth that when corporations merge the surviving corporation succeeds to both the rights and liabilities of the constituent corporation. 15 Pa.C.S. § 1929; *Berks County Trust Co. v. Kotzen,* 326 Pa. 541, 192 A. 638, 639 (1937); *Childers v. Power Line Equipment Rentals, Inc.,* 452 Pa.Super. 94, 681 A.2d 201, 212 (1996), *alloc. denied,* 547 Pa. 735, 690 A.2d 236 (1997). If we allowed a surviving company to deny responsibility for hearing loss caused by its predecessor, we would be sanctioning corporate restructuring as a means of escaping liability. We agree with the Commonwealth Court that such a result would not advance the humanitarian objectives of the Act. Thus, the Commonwealth Court committed no error of law in finding that there was substantial evidence for the WCJ to

conclude that LTV was the sole employer of Mozena.[16] We
will not disturb a determination by the WCJ based on sub-
stantial and competent evidence.

## · CONCLUSION

 Because there is no way to distinguish, scientifically
or mathematically, the amount of hearing loss caused by
acoustic trauma [17] from that caused by the aging process, and
Act 1 provides for no standard to measure presbycusis, we
find that Act 1 of 1995 does not permit a deduction from a
claimant's total binaural hearing impairment for that portion
of the impairment caused by presbycusis. Therefore, you can
not deduct that portion of the impairment caused by presbycu-
sis from the total binaural hearing impairment. We therefore
find that the WCJ, the Board, and the Commonwealth Court
were correct in their findings concerning presbycusis in the
case of LTV Steel Company, Inc. (Mozena) and USX Corpora-
tion (Rich).

We also find that LTV is liable for the full hearing loss
suffered by Mozena. The mergers, acquisitions, or other

**16.** LTV argues that the Commonwealth Court erred by disregarding its
precedent in *Fisher v. Commonwealth,* 45 Pa.Cmwlth. 516, 405 A.2d
1039 (1979) and *Baughman v. Meadville Malleable Iron,* 39 Pa.Cmwlth.
4, 394 A.2d 1058 (1978). In those cases, the Commonwealth Court
found the injured employees had worked for separate employers, which
had been involved in a merger. However, we accept the position of the
Commonwealth Court that these cases are controlled by a distinct
provision of the Occupational Disease Act (ODA), Act of June 21, 1939,
P.L. 566, *as amended,* 77 P.S. § 1201 et seq. Section 301(g) of the ODA
expressly mandates that when there are successive employers, unless
the Commonwealth can prove that the last employer is responsible for
the complete injury, the Commonwealth becomes entirely liable for
compensation for total disability or death caused by occupational
diseases,. as defined in the OCD. 77 P.S. § 1401(g). We note that the
OCD expressly excludes as an occupational disease partial loss of
hearing. 77 P.S. § 1208(n). Moreover, because there are vast differ-
ences between the language, the purposes, and the policy consider-
ations of Section 301(g) of the OCD and Section 306(c)(8)(vi) of Act 1,
we agree with the Commonwealth Court that neither case is persuasive
in a claim petition for hearing loss.

**17.** Acoustic trauma is an injury to the hearing mechanisms within the
inner ear, caused by excessively loud noise, such as static from tele-
phones, heavy machinery, or explosions. OTORHINOLARYNGOLGY,
*supra* note 5, at 1093.

changes in corporate structure occurring from 1974 to 1984 did not constitute the creation of a new employer for determining the amount of hearing loss caused by any one employer. We have looked at the totality of the circumstances concerning the acquisition of the corporation, and the conditions that make certain that the new owner is a successor-in-interest and not a new employer, and we find, therefore, there was substantial evidence to conclude that LTV was the sole employer of Mozena.

For these reasons, we affirm the decision of the Commonwealth Court.