# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Aliya T. Taylor, : 
                 Petitioner : 
   : 
           v. : No. 2327 C.D. 2015
   : Submitted: May 20, 2016
Workers' Compensation Appeal : 
Board (City of Philadelphia), : 
                 Respondent : 

BEFORE:     HONORABLE RENÉE COHN JUBELIRER, Judge
                 HONORABLE MICHAEL H. WOJCIK, Judge
                 HONORABLE ROCHELLE S. FRIEDMAN, Senior Judge

## OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE COHN JUBELIRER           FILED: September 12, 2016

Aliya T. Taylor (Claimant) petitions for review of an Order of the Workers' Compensation Appeal Board (Board), affirming a Workers' Compensation Judge's (WCJ) Decision to grant the City of Philadelphia's (Employer) Termination Petition and dismiss Employer's Suspension Petition as moot. On appeal, Claimant contends that the WCJ erred by relying on the testimony of Employer's medical expert who was unaware of an acknowledged injury listed on the Notice of Compensation Payable (NCP); that the WCJ did not issue a reasoned decision; and that the WCJ capriciously disregarded competent evidence. We affirm.

Claimant, a police officer, was injured on April 16, 2012, while in the course and scope of her employment when she lifted an elderly person from the floor and onto a bed. (WCJ Decision, Findings of Fact (FOF) ¶ 1.) On May 3, 2012, Employer issued a NCP acknowledging an injury described as "'low back and left leg strain and sprain.'" (Id.; NCP, R.R. at 2a.) "Pursuant to the NCP, Claimant received her full salary through Employer's Heart and Lung Act[1] program in lieu of workers' compensation indemnity benefits." (FOF ¶ 1.)

Employer filed a Termination Petition on or about January 30, 2013, alleging that Claimant fully recovered from her accepted injury as of December 5, 2012, and is capable of returning to full duty work. (R.R. at 4a-5a.) Claimant filed an Answer to the Termination Petition on March 15, 2013, denying all allegations and demanding strict proof. (R.R. at 6a-7a.) Then, on October 14, 2013, Employer filed Petitions to Suspend and/or Modify Workers' Compensation Benefits (Suspension Petition) alleging that Claimant was unable to work due to a non-work related injury suffered on August 2013.[2] (WCJ Decision at 1.) The matters were consolidated and assigned to the WCJ for hearing and disposition.

In support of the Termination Petition, Employer submitted the deposition testimonies of Armando A. Mendez, M.D., and Claimant. In opposition to the Petitions, Claimant presented the deposition testimony of Rocco Costabile, M.D. and testified at a hearing in front of the WCJ on June 9, 2014. The testimonies are discussed below in chronological order.

---

[1] Act of June 28, 1935, P.L. 477, as amended, 53 P.S. §§ 637-38.
[2] The WCJ identifies this date as occurring in August 2012, but the record shows that Claimant sustained a non-work-related stroke in August 2013, which removed her from work.

Dr. Mendez testified as follows in a June 7, 2013 deposition. Dr. Mendez's medical practice consists of treating 100 to 125 patients per week that present with musculoskeletal complaints. (Mendez's Dep. at 5.) He performs about 25 operations per month, but does not have a specialty within the field of orthopedic surgery. (Id. at 5-6.) Dr. Mendez examined Claimant on December 5, 2010. (Id. at 8.) At the examination, Claimant told Dr. Mendez that in the course of her employment as a police officer she, along with another officer, attempted to lift an individual from the floor. (Id.) Claimant "felt pain in her lower back that radiated down her left leg and it caused her numbness and tingling in her left leg." (Id.) Claimant relayed to Dr. Mendez that the pain got worse the following day. (Id.) Dr. Mendez took a medical history of Claimant and was informed that Claimant was taking a muscle relaxer, Robaxin, and anti-inflammatory medicine, Tramadol, and that prior to the incident Claimant never had any problems with her lower back or left leg. (Id. at 10.)

Dr. Mendez conducted a physical examination on Claimant's back and legs. The examination revealed that Claimant had a normal and stable gait, and complaint about pain with forward flexion and extension of her lumbar spine. (Id. at 11.) Dr. Mendez examined Claimant's lower extremities in the prone position, which led to complaints of pain in the lower back. (Id. at 12.) Dr. Mendez found "no good anatomical explanation of her complaints of back pain when she is prone and her knees were bent, as this [position] relaxes the muscles of the hamstrings and lower back, and actually should relieve any back pain rather than create any back pain." (Id. at 12-13.) Claimant was examined in the seated and supine positions and no pain was found. (Id. at 13-14.)

3

Dr. Mendez also reviewed medical reports available at the time of the examination and some reports given to him the day of his deposition. The reports included an x-ray, EMG, and MRI taken shortly after the injury. The x-ray of the lumbar spine showed "endplate spurring in the lower lumbar region consistent with a chronic degenerative process . . . ." (Id. at 15.) Dr. Mendez characterized the finding as "not an acute finding[,] but rather something that you see develops over years." (Id. at 16.) An EMG test was conducted in conjunction with the x-ray. (Id.) The EMG did not suggest the presence of a radicular problem, or "abnormalities of any of the nerve roots of the lumbar spine." (Id.) The EMG was consistent with the x-ray, and Dr. Mendez did not observe any herniated discs, fractures, dislocations, or anything else of an acute nature. (Id. at 17.) A February 21, 2013 MRI revealed, with regard to the L5-S1 level:

> a mild disc bulge with a superimposed small broad-based right paracentral disc extrusion with minimal inferior migration and underlying annular fissure . . . . This context traverses the right S1 nerve ro[ot] at the level of the subarticular recess. No additional central spinal stenosis. Mild and bilateral facet hypertrophy with minimal fluid in the facet joints. Mild bilateral neural foraminal stenosis.

(Id. at 22.) However, Dr. Mendez did not find that MRI particularly helpful

> [b]ecause the findings starting at L5-S1 state that the disc extrusion is to the right side. [Claimant]'s symptoms were not to the right side; and therefore, the findings at the L5-S1 level have no correlation with the symptoms that [Claimant] presented to me with when I saw her. With regard to the L4-5 level, there was nothing suggesting that there is any compression of the nerve ro[ot] at that level on the left side that would correlate to her left-sided symptoms, which did not appear to follow a dermatomal pattern . . . .

4

(Id. at 23-24.) Dr. Mendez explained that something occurred to Claimant when she lifted the individual and that it can best be assumed to have been a lumbar spine sprain and strain. (Id. at 19.) Dr. Mendez concluded, with a reasonable degree of medical certainty, that Claimant recovered from the injury she had described to him and those revealed in the medical records. (Id.)

On cross-examination, Claimant's counsel focused his questions, in large part, on Dr. Mendez's examination of Claimant's left leg. The following exchange occurred between Claimant's counsel and Dr. Mendez:

> [CLAIMANT'S COUNSEL]: Do you believe that [Claimant] injured any part of her body other than her lumbar spine on April 16, 2012?
> [DR. MENDEZ]: I do not, and I don't recall her telling me about any other injury to her musculoskeletal system at the time of her work injury.
> [CLAIMANT'S COUNSEL]: Well did you ask her?
> [DR. MENDEZ]: Yes. I asked her what her injuries were, what had occurred, and if she had symptoms that resulted from her work-related incident. So, yes, I did ask her.
> [CLAIMANT'S COUNSEL]: You're not aware that she injured her left leg, are you, Doctor?
> [DR. MENDEZ]: No, I'm not aware that she injured her left leg. She did not report to me any injury to her left leg.
> [CLAIMANT'S COUNSEL]: So if I were to suggest to you that the [NCP] indicates that, in fact, she did injure her left leg, that would be a surprise to you, wouldn't it?
> [DR. MENEDEZ]: That would be a surprise to me.

(Id. at 25-26.) Later in the deposition, Dr. Mendez clarified:

> You'll have to define what injury to her left leg is. I was aware that she was having symptoms in her left leg. She told me about that. So I don't know if that's what you're referring to as injured her left leg, if it's something other than that. . . . I asked [Claimant] where she was having symptoms, and she told me that she was having symptoms in her back and left leg. But those were related to each other in the sense that the pain was radiating pain from her back. It was not a separate injury to her left leg such as a laceration to her left leg or a contusion

5

to her left leg or some other traumatic event to the left leg separate from her back injury.

(Id. at 32-33.)

On redirect, Employer's counsel and Dr. Mendez engaged in the following discussion:

> [EMPLOYER'S COUNSEL]: Doctor, to the extent that someone may have diagnosed a sprain and strain of the leg, did you examine the left leg to the extent that you were able to determine whether or not she had ongoing symptoms or complaints or findings relative to a contusion or a sprain and strain?
> [DR. MENDEZ]: I did examine her left leg. There was absolutely nothing whatsoever on her physical examination when I saw her that she continued to suffer from any injury to her left leg including any evidence of radiculopathy, radiculitis, sprain, strain, contusion, laceration or any other diagnosis of an orthopedic nature which I'm aware of.
> [EMPLOYER'S COUNSEL]: All right. So if she had sprain and strain of the leg, did you find any evidence of that?
> [DR. MENDEZ]: I found nothing wrong with her left leg that day including a sprain or strain.

(Id. at 35-36.)

Claimant presented the deposition of Dr. Costabile, who is Claimant's Heart and Lung Act primary care physician. Dr. Costabile testified as follows. He first saw Claimant on August 30, 2012, after she was transferred to his care from a different doctor. (Costabile's Dep. at 10.) Dr. Costabile took a history from Claimant, where Claimant explained her injury and symptoms. (Id. at 10-11.) His physical examination of Claimant focused on her lumbosacral spine region and lower extremities. Claimant exhibited restricted range of motion, a straight leg test on her left lower extremity was positive, and Claimant "had some difficulty with lower extremity strength." (Id. at 12.) After reviewing notes from Claimant's

6

previous doctors, records, and imaging, Dr. Costabile diagnosed Claimant with lumbar disc bulge with radiculopathy. (Id. at 14.) Dr. Costabile noted that Claimant received trigger point injections of cortisone in the past. (Id. at 15.)

Dr. Costabile referred Claimant to chiropractic care and prescribed Tramadol for pain and Robaxin as a muscle relaxant. (Id. at 17.) Claimant saw a spinal surgical specialist, Dr. Anderson, who recommended that she undergo aggressive physical therapy, which ultimately did not provide Claimant with any relief. (Id. at 18-19.) Dr. Costabile added a pain medication called Neurontin[3] to Claimant's regimen and gave her a lumbosacral back brace. (Id. at 20.) Claimant's medications can cause headaches, sedation, and confusion. (Id. at 22.) Dr. Costabile continued to see Claimant every two weeks and opined, with a reasonable degree of medical certainty, that Claimant has not fully recovered from her work-related injuries. (Id. at 22-23.) According to Dr. Costabile:

> I think in combination with the symptoms from her lumbosacral pathology that persist, the added medication that we have on board right now, which is helping to alleviate her symptoms to a degree can tend towards leading to psychomotor slowing, some sedation, some lack of concentration, even some fatigue that I do not think would make her a suitable candidate to perform all of the duties of her full duty requirements. . . . [W]ith the medications she has not shown me that she can perform a high level cardiovascular activity that would potentially be required in chasing someone in not only a foot pursuit but potentially car pursuit; that she would have the motor reflex skills to safely use her firearms or asp,[4] or taser that could put herself or even a partner in danger . . . .

(Id. at 23-24.)

---

[3] Neurontin is the brand name for Gabapentin. (Hr'g Tr. at 11.)
[4] Dr. Costabile likened an "asp" to a "night stick." (Costabile's Dep. at 25.)

7

On cross-examination, Dr. Costabile was confronted with reports of other doctors with whom he consulted that showed a differing of opinion. (Id. at 30-32.) He was further confronted with the EMG results that did not show any radiculopathy. (Id. at 32.) Dr. Costabile explained that "[EMG tests] are good to rule in a diagnosis. They are not good to rule out a diagnosis." (Id. at 33.) He continued:

> This particular injured patient also describes a neuropathic radiculopathy meaning a sensory change. EMG and nerve conduction study tests are not meant to pick up nerve conduction changes from sensory nerves, rather they are meant to pick up conduction changes from motor nerves. This patient has much less of a motor lower extremity symptomatology, than a neurologic.

(Id. at 34.)

In support of its Termination Petition, Employer next presented Claimant's deposition testimony taken on January 24, 2014. Claimant testified as follows. Claimant had a stroke in August 2013, after both medical experts testified in this matter. (Claimant's Dep. at 5.) She went on leave from work starting August 27, 2013. (Id. at 6.) Prior to her August 2013 leave, Claimant was on limited duty status related to her April 16, 2012 injury, during which time her duties were to answer phones and input incident reports in to the computer system. (Id. at 8.) After her stroke and August 2013 leave, Claimant was released to limited duty status by her doctor, Dr. Kramer, and returned to work on December 31, 2013. (Id. at 7, 12.) Due to the impact of the stroke on her speech, Claimant was no longer able to answer phones and instead focused her work on inputting incident reports. (Id. at 13.)

Claimant continues to treat for her work injuries with Dr. Costabile every two weeks. (Id. at 9.) Her condition has not improved and she is prescribed

8

Tramadol, Gabapentin, and a muscle relaxant. (Id. at 9-10.) Claimant also treats with a chiropractor two times per week that provides her with temporary relief. (Id. at 14-15.) She walks with a limp and uses a cane and back brace for support, though she was using neither during her deposition. (Id. at 11-12.) Claimant is also seeing Dr. Kramer for her stroke and is receiving speech therapy, though the therapy has paused due to insurance coverage issues. (Id. at 12, 15-16.) Claimant hopes to return to full duty when possible, but none of her doctors have released her to full duty status as of yet. (Id. at 17-18.)

Claimant testified on her own behalf in front of the WCJ on June 9, 2014, in opposition to Employer's Suspension Petition. Claimant testified for only a few minutes and stated that she still treats with Dr. Costabile once a month and is on the same medications she was on at the time of her deposition testimony. (Hr'g Tr. at 6-7, 11.) Claimant stated that she is no longer being treated for her stroke, but she continues to have a speech impediment. (Id. at 7.) Claimant has not been released to full duty work and believes that she has not fully recovered from her work injury of April 16, 2012. (Id.)

The WCJ assessed the testimony and evidence and made the following relevant credibility determinations and findings of fact.

> 1. On April 16, 2012, while working for Employer, Claimant slipped while lifting an elderly patient off the floor and onto a bed. As a result of the work incident, Employer accepted Claimant's work injury as compensable through a [NCP], dated May 3, 2012, and described it as a "low back and left leg strain and sprain." Pursuant to the NCP, Claimant received her full salary through Employer's Heart and Lung Act program in lieu of workers' compensation indemnity benefits.
>
> . . .

9

5. This Judge finds, after considering all of the evidence in its entirety, that the testimony of Dr. Mendez is credible and convincing that Claimant has fully recovered from her work-related injuries, including her low back strain and sprain and any left leg injury she may have suffered. This is based, at least in part, upon Dr. Mendez' credentials as a board-certified orthopedic surgeon and the fact that his examination findings and opinions are consistent with the medical records and diagnostic studies. Dr. Mendez's explanation of the degenerative nature of the findings on the MRIs was cogent, clear and convincing, especially considering his actual review of the diagnostic films. Therefore, the opinions of Dr. Mendez are accepted in their entirety.

6. This Judge finds, after considering all of the evidence in its entirety, that the testimony of Dr. Costabile is not credible and not convincing that Claimant has not fully recovered from her work injuries. This is based, at least in part, upon Dr. Costabile's lesser qualifications in the field of orthopedics as compared to Dr. Mendez. Furthermore, Dr. Costabile's diagnoses . . . appear [to be] based upon Claimant's subjective presentation rather than [on] any objective traumatic findings. Therefore, the opinions of Dr. Costabile are rejected where they conflict with Dr. Mendez.

7. This Judge finds, after considering all of the evidence in its entirety, that the testimony of Claimant is not credible and convincing to the extent that it contradicts the credible evidence of record. While this Judge did not personally view Claimant's testimony, this Judge is concerned [that her testimony] regarding her . . . symptoms [is] not in accordance with the findings of Dr. Mendez. Additionally, Claimant's testimony that her taking of medication limits her ability to return to work seems at odds with her actual return to work in light duty capacity. This Judge rejects Claimant's testimony as to any ongoing residual effects of her work injury as same [sic] is in direct contradiction with the credible medical evidence of record.

8. This Judge finds as fact that Employer has sustained its burden of proving that it is entitled to a termination of Claimant's benefits as of December 5, 2012 on the basis that Claimant has fully recovered from her work-related injury and is capable of returning to full duty work without restrictions.

10

(FOF ¶¶ 1, 5-8.) Accordingly, the WCJ concluded that Employer "met its burden under its Termination Petition to show that Claimant fully recovered from her accepted April 16, 2012 work injury." (WCJ Decision, Conclusion of Law ¶ 2.) The WCJ terminated Employer's liability as of December 5, 2012 and, given his determination on the Termination Petition, held that the Suspension Petition was moot. Claimant appealed to the Board, which affirmed. Claimant now petitions this Court for review.[5, 6]

On appeal, Claimant first argues that the WCJ and Board erred by granting Employer's Termination Petition when Employer acknowledged an injury to Claimant's left leg in the NCP and Employer's medical expert, Dr. Mendez, testified that he was unaware of an acknowledged left leg injury. Claimant contends that Dr. Mendez's testimony shows that he lacked comprehension of Claimant's leg injury and that the examination was rushed.

"To succeed in a termination petition, an employer bears the burden of proving by substantial evidence that a claimant's disability ceased, or any remaining conditions are unrelated to the work injury." Westmoreland Cnty. v. Workers' Comp. Appeal Bd. (Fuller), 942 A.2d 213, 217 (Pa. Cmwlth. 2008). According to our Supreme Court,

> [i]n a case where the claimant complains of continued pain, this burden is met when an employer's medical expert unequivocally testifies that it is his opinion, within a reasonable degree of medical

---

[5] Our review is limited to "determining whether there has been a violation of constitutional rights, [whether] errors of law [were] committed, [whether] a violation of appeal board procedures [occurred], and whether necessary findings of fact are supported by substantial evidence." Mark v. Workers' Comp. Appeal Bd. (McCurdy), 894 A.2d 229, 233 n.6 (Pa. Cmwlth. 2006).

[6] Pursuant to our Order of May 13, 2016, Employer was precluded from filing a brief in this matter for failure to comply with an earlier order directing it to file a brief.

11

certainty, that the claimant is fully recovered, can return to work without restrictions and that there are no objective medical findings which either substantiate the claims of pain or connect them to the work injury. If the WCJ credits this testimony, the termination of benefits is proper.

Udvari v. Workmen's Comp. Appeal Bd. (USAir, Inc.), 705 A.2d 1290, 1293 (Pa. 1997) (footnote omitted). The credited testimony must address the injury as described in the NCP, and "neither party can re-litigate the nature of the accepted injury" in a proceeding on a termination petition. GA & FC Wagman, Inc. v. Workers' Comp. Appeal Bd. (Aucker), 785 A.2d 1087, 1092 (Pa. Cmwlth. 2001).

Here, the NCP acknowledges an injury described as "low back & left leg" "strain & sprain." (NCP, R.R. at 2a.) While Dr. Mendez was "surprised" that Employer acknowledged an injury to Claimant's left leg, he was "aware that she was having *symptoms* in her left leg." (Mendez's Dep. at 32 (emphasis added).) Dr. Mendez testified that he did not know what was meant when Claimant's attorney asked him about an injured left leg and that the symptoms in her leg were related to Claimant's back pain "in the sense that the pain was radiating pain from her back. It was not a separate injury to her left leg such as a laceration to her left leg or a contusion to her left leg or some other traumatic event to the left leg." (Id. at 32-33.) Dr. Mendez further testified that he examined Claimant's left leg, and if Claimant had suffered any injury to her left leg, he did not see any evidence of it in his examination. (Id. at 36.)

It is well settled that in workers' compensation cases, "[t]he WCJ is the ultimate finder of fact, and the exclusive arbiter of credibility and evidentiary weight." LTV Steel Co., Inc. v. Workers' Comp. Appeal Bd. (Mozena), 754 A.2d 666, 676 (Pa. 2000). In executing its fact finding role, "the WCJ is free to accept or reject, in whole or in part, the testimony of any witness." Id. The WCJ's

evidentiary findings are not, however, immune from review. "The WCJ must base [his or her] decision on substantial evidence."[7] Id. Here, the WCJ evaluated the testimony of Dr. Mendez regarding Claimant's back and left leg and found that he credibly concluded that Claimant has recovered from the injury listed in the NCP. While the presence of contrary evidence is of no moment if the WCJ credits competent evidence supporting his finding, Pocono Mountain School District v. Workers' Compensation Appeal Board (Easterling), 113 A.3d 909, 918 (Pa. Cmwlth. 2015), Dr. Mendez's understanding of Claimant's leg injury mirrors Claimant's own testimony and the testimony of Dr. Costabile. No witness alleged that Claimant was injured in her leg in any other way than through leg pain radiating from her back or caused by her "lumbosacral pathology." (Costabile's Dep. at 23.)

Claimant next argues that the WCJ did not "issue a reasoned decision and capriciously disregarded material, competent evidence which logically could not have been avoided in reaching a decision." (Claimant's Br. at 18.) However, Claimant points to no evidence that was capriciously disregarded, and as such, we cannot review the Board's Order in this regard. With regard to Claimant's

---

[7] Substantial evidence is defined as

relevant evidence that a 'reasonable person might accept as adequate to support a conclusion.' In reviewing a decision for substantial evidence, the court must view the evidence in the light most favorable to the party who prevailed before the WCJ and draw all reasonable inferences from the evidence in favor of the prevailing party. . . . [I]t is irrelevant whether the record contains evidence to support findings other than those made by the WCJ; the critical inquiry is whether there is evidence to support the findings actually made.

Pocono Mountain Sch. Dist. v. Workers' Comp. Appeal Bd. (Easterling), 113 A.3d 909, 918 (Pa. Cmwlth. 2015) (citations and quotations omitted).

13

argument that the WCJ did not issue a reasoned decision, Section 422(a) of the Workers' Compensation Act (Act)[8] provides in relevant part:

> All parties to an adjudicatory proceeding are entitled to a reasoned decision containing findings of fact and conclusions of law based upon the evidence as a whole which clearly and concisely states and explains the rationale for the decisions so that all can determine why and how a particular result was reached . . . . When faced with conflicting evidence, the workers' compensation judge must adequately explain the reasons for rejecting or discrediting competent evidence. Uncontroverted evidence may not be rejected for no reason or for an irrational reason; the workers' compensation judge must identify that evidence and explain adequately the reasons for its rejection. The adjudication shall provide the basis for meaningful appellate review.

77 P.S. § 834.

Our Supreme Court interpreted this provision in <u>Daniels v. Workers' Compensation Appeal Board (Tristate Transport)</u>, 828 A.2d 1043 (Pa. 2003), where it held "that a decision is 'reasoned' for purposes of Section 422(a) if it allows for adequate review by the [Board] without further elucidation and if it allows for adequate review by the appellate courts under applicable review standards." <u>Id.</u> at 1052. "In a case where the fact-finder has had the advantage of seeing the witnesses testify and assessing their demeanor, a mere conclusion as to which witness was deemed credible, in the absence of some special circumstance, could be sufficient to render the decision adequately 'reasoned.'" <u>Id.</u> at 1053. In situations where the WCJ did not have the advantage of making demeanor-based credibility assessments through viewing the live testimony of witnesses, <u>Daniels</u> requires a WCJ to provide "some articulation of the actual objective basis for the

---

[8] Act of June 2, 1915, P.L. 736, <u>as amended</u>, 77 P.S. § 834.

14

credibility determination." Id. A WCJ may look at "countless objective factors" when assessing a witness's credibility. Id. The factors relied upon must be identified and articulated in the WCJ's findings. Dorsey v. Workers' Comp. Appeal Bd. (Crossing Constr. Co.), 893 A.2d 191, 195 (Pa. Cmwlth. 2006).

Here, the WCJ did not witness Claimant's deposition testimony taken on January 24, 2014, but did witness Claimant's live testimony of June 9, 2014. Yet, the WCJ made his credibility determination as if he never saw Claimant testify. (FOF ¶ 7.) The WCJ stated: *"[w]hile this Judge did not personally view Claimant's testimony*, this Judge is concerned regarding her testified [sic] to symptoms are not in accordance with the findings of Dr. Mendez." (Id. (emphasis added).)

When examining this issue, the Board concluded that "whether the WCJ observed Claimant testify or not had no apparent bearing on the result of this case" as "the WCJ's concerns were clearly focused on the subject of Claimant's testimony, not her demeanor." (Board Op. at 8.) We agree. While Daniels stands for the proposition that a demeanor-based credibility determination could be sufficient under Section 422(a) of the Act, nothing in Daniels or its progeny mandates a WCJ who has witnessed a Claimant testify to make a credibility determination based on demeanor. Articulation of objective factors supporting credibility determinations are sufficient under Section 422(a) of the Act regardless of whether demeanor based assessments could have been made. Because the WCJ provided the requisite objective factors supporting his credibility determination, we conclude that the WCJ issued a reasoned decision within the meaning of Section 422(a) of the Act.

15

As we find that the WCJ's factual findings are supported by substantial evidence, and the WCJ issued a reasoned decision, the Order of the Board is affirmed.

_____
**RENÉE COHN JUBELIRER,** Judge

16

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

Aliya T. Taylor,                  :
               Petitioner      :
                                 :
            v.              :    No. 2327 C.D. 2015
                                 :
Workers' Compensation Appeal      :
Board (City of Philadelphia),        :
               Respondent    :

## O R D E R

**NOW**, September 12, 2016, the Order of the Workers' Compensation Appeal Board, entered in the above-captioned matter, is hereby **AFFIRMED**.

 

 

_____

**RENÉE COHN JUBELIRER,** Judge