**Edward HAYDUK, Petitioner**

v.

**WORKERS' COMPENSATION APPEAL BOARD (BEMIS CO., INC.), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs June 16, 2006.

Decided Aug. 11, 2006.

Reconsideration Denied Oct. 3, 2006.

Jason M. Weinstock, Harrisburg, for petitioner.

Marta J. Guhl, Philadelphia, for respondent.

BEFORE: McGINLEY, Judge, and FRIEDMAN, Judge, and LEADBETTER, Judge.

OPINION BY Judge McGINLEY.

Edward Hayduk (Claimant) petitions for review from the order of the Workers' Compensation Appeal Board (Board) which reversed the decision of the Workers' Compensation Judge (WCJ) in part and affirmed in part. The Board reversed that portion of the WCJ's order that granted Claimant's claim petition and awarded costs related to the claim petition. The Board affirmed that portion of the order that Bemis Co., Inc. (Employer) presented a reasonable contest.

Claimant worked twenty-seven years as a maintenance mechanic at a plant that manufactured plastic wrappers for bakery products. He retired in July 1999. Though Claimant worked at the same plant for twenty-seven years, the plant had a number of different owners. Employer acquired the plant as part of an asset purchase agreement from Princeton Packaging Holdings, Inc. (Princeton) on February 5, 1993.

Claimant became aware in late 2001, and early 2002, that he suffered from hearing loss. His physician, Mohammed M. Akbar, M.D. (Dr. Akbar) informed him that the hearing loss was work-related. On January 24, 2002, Claimant petitioned for benefits and alleged that he suffered "[p]ermanent binaural hearing loss impairment of 15.6%" as a result of "[l]ong term exposure to hazardous occupational noise at Bemis Co., Inc. [Employer]." Claim Petition, January 24, 2002, at 1; Reproduced Record (R.R.) at 2a. On August 22, 2002, Claimant petitioned for penalties and alleged that Employer violated the Workers' Compensation Act (Act)[1] when it "failed to pay the Claimant's mileage to attend the IME [Independent Medical Examination] as well as his reimbursable expenses." Penalty Petition, August 22,

2002, at 1; R.R. at 65a. The WCJ consolidated these petitions.

In support of his allegations, Claimant testified before the WCJ that as a maintenance mechanic his duties included the repair of machinery and the upkeep of machinery including greasing and oiling. Notes of Testimony, March 6, 2002, (N.T.) at 7; R.R. at 13a. Claimant testified that employees were required to wear hearing protection for approximately the last five years he worked. N.T. at 8; R.R. at 14a. For approximately the last ten years of his employment, Claimant worked in the "poly x" section. N.T. at 9; R.R. at 15a. Claimant described his working conditions and the noise associated with the roots blower room, the grinder, and the extruders. N.T. at 9–12; R.R. at 15a–18a. Claimant explained that at times he would remove his ear protection to make sure that someone with whom he was working could hear him. N.T. at 13; R.R. at 19a. On cross-examination, Claimant stated that his hearing had declined "a little bit" in the three years since his retirement and that he first noticed a problem with his hearing when his wife noted how high he kept the volume on the television in 1997. N.T. at 24; R.R. at 30a. Claimant estimated that he used hearing protection about one half of the years he worked at the plant. N.T. at 41; R.R. at 47a.

Claimant submitted medical reports from Dr. Akbar. In a report dated January 15, 2002, Dr. Akbar noted he examined Claimant on October 12, 2001. Using the AMA Guidelines, Dr. Akbar calculated a permanent hearing impairment of 15.0% in Claimant's right ear and 18.8% in Claimant's left ear. Dr. Akbar further calculated Claimant with a 15.6% binaural impairment. Based on Claimant's medical records and history, Dr. Akbar opined that

---

1. Act of June 2, 1915, P.L. 736, *as amended,*    77 P.S. §§ 1–1041.4, 2501–2626.

Claimant's hearing loss was primarily work-related. Report of Mohammad M. Akbar, M.D., January 15, 2002, at 1; R.R. at 57a.

Claimant presented the deposition testimony of Thomas W. Copeland (Copeland), a maintenance mechanic with Employer and a union shop steward at the time Employer purchased the facility. Copeland testified that in December 1992, Neal Ganly, president of the flexible packaging division for Employer, and Dennis Lambert, superintendent of the press room for Employer, conducted some informational meetings about the upcoming takeover by Employer. Deposition of Thomas W. Copeland and Elizabeth Perrong, May 7, 2003, (Copeland and Perrong Deposition) at 18–19; R.R. at 364a–365a.[2] Copeland reported that the employees were told that every employee would retain his or her job and that seniority would remain the same. Copeland and Perrong Deposition at 22; R.R. at 368a. Copeland was involved in negotiations between Employer, Princeton, and the union starting in mid-December 1992. Copeland and Perrong Deposition at 23–24; R.R. at 369a–370a. Employer wanted changes in the union's collective bargaining agreement with respect to vacation leave, holidays, retirement, and health insurance. The union gave back two weeks of vacation, one holiday, and changed the retirement plan. The parties also agreed to make modifications in the health insurance plan. Copeland and Perrong Deposition at 30–31; R.R. at 376a–377a. When Employer took over on February 5, 1993, the procedures for human resources and grievances did not change,

though Employer did change the absenteeism program and the health and safety rules. Employer attempted to change the layoff procedures, break periods, and pay days, but the Union grieved all three issues. Copeland and Perrong Deposition at 33–35; R.R. at 379a–381a. All of the approximate number of 450 employees of Princeton went straight from Princeton to Employer except for those on sick leave and workers' compensation. Copeland and Perrong Deposition at 42–43; R.R. at 388a–389a. On cross-examination, Copeland admitted that Employer did not have any kind of relationship with Princeton other than the purchase of its assets. Copeland and Perrong Deposition at 58–59; R.R. at 404a–405a.

Richard Sebring (Sebring), production manager for Employer, testified that he was involved in contract negotiations between Employer and the union in the period leading up to Employer's purchase of Princeton's assets. Sebring served as an advisor to Employer during the negotiation. Sebring testified that Employer and Union Local 735 conducted a "full negotiation to the contract." Notes of Testimony, September 18, 2002, (N.T. 9/18/02) at 8–9; R.R. at 76a–77a. Sebring also testified that Employer informed him that it was purchasing the assets of Princeton. N.T. 9/18/02 at 13; R.R. at 81a.

Employer also submitted a letter from Alan M. Miller, M.D. (Dr. Miller) dated July 2, 2002. In the letter, Dr. Miller reported that he examined Claimant on April 4, 2002, reviewed records of his hearing, and took a history. Dr. Miller opined

---

**2.** Elizabeth Perrong (Perrong), was assistant manager for Employer. Perrong testified that Employer's hearing records for its employees went back prior to the time Employer purchased the plant because OSHA required medical records to be kept for thirty years after an employee's termination of employment. Perrong testified that Employer retained information about employee job classifications and hourly rates as part of the collective bargaining agreement after it took over the plant. Copeland and Perrong Deposition at 130–131; R.R. at 475a–476a.

that Claimant suffered from hearing loss of 11.25% in the right ear, 16.87% in the left ear with a binaural loss of 12.18%. Letter from Alan M. Miller, M.D., July 2, 2002, at 2; R.R. at 139a.

Employer also submitted letters from Dr. Miller dated October 28, 2002, and November 14, 2002. In the October 28, 2002, letter, Dr. Miller reviewed medical records, audiograms, and letters prepared by Dr. Akbar. In light of his review of those records, Dr. Miller reached the following conclusion:

> Mr. Hayduk [Claimant] became an employee of Bemis Company 2/5/93. Serial audiograms bracketing this time frame are 1/26/94 and 12/17/92. The audiogram that immediately preceded Bemis' acquisition showed a bilateral neurosensory hearing loss of 6.25%. The audiogram obtained less than one year following that acquisition showed a binaural loss of 12.1%. At the time of Mr. Hayduk's retirement in July of 1999, the binaural hearing loss predicated upon the audiogram of 7/21/99 was 12.18% which was essentially no change from the binaural hearing evaluation of 1/26/94. At the time Bemis became responsible for the assets of the company Mr. Hayduk had a pre-existing neurosensory hearing loss of 6.25%. The total amount of loss that occurred from the pre-existing to the time of the end of his employment represents 5.93%.

> The audiograms performed by Dr. Akbar and the letters indicating a 15.6% binaural loss are predicated upon studies performed several years after Mr. Hayduk had retired from Bemis Corporation. This further deterioration in the patient's auditory acuity is not a reflection of noise exposure since it is a known fact that once the individual is removed from the noise there can be no continuing damage by noise exposure. This

further deterioration in the patient's auditory acuity is a reflection of pathology other than noise exposure.

> In view of the new information that has been provided it is my opinion within a reasonable degree of medical certainty that the majority of Mr. Hayduk's neurosensory hearing loss pre-existed his employment by Bemis Corporation. During the time frame he was employed at Bemis there was a 5.93% further deterioration in his auditory acuity. It is evident that the majority of neurosensory loss that this patient sustained occurred prior to employment by Bemis Corporation.

Letter from Alan M. Miller, M.D., October 28, 2002, at 1–2; R.R. at 212a–213a. In his November 14, 2002, letter, Dr. Miller reiterated that Claimant did not suffer a loss of hearing of 10% or greater while employed by Employer.

Employer also presented the deposition testimony of Larry Schwanke (Schwanke), formerly the vice president of human resources for Employer. Schwanke identified a copy of the asset purchase agreement between Employer and Princeton. Schwanke was involved in drafting the language in the asset purchase agreement which related to human resources and insurance issues. Schwanke said that after reviewing the existing labor agreement between the union and Princeton, Employer made it clear to Princeton that without a new labor agreement that was acceptable to Employer there would be no purchase of Princeton's assets. Deposition of Larry Schwanke, December 23, 2002, (Schwanke Deposition) at 13; R.R. at 226a. Schwanke testified that the sale would not have taken place without a new labor agreement in place. Schwanke Deposition at 15–16; R.R. at 228a–229a. Changes in the new contract included a management rights clause, leave of absence provisions,

the scheduling of vacations, the number of holidays, vacation time, and changes in the pension from the "graphic communication union law by employer pension plan" to a defined contribution plan administered by Employer. Schwanke Deposition at 17–18; R.R. at 230a–231a. Schwanke explained that Employer only purchased the assets of Princeton. Schwanke Deposition at 22; R.R. at 235a. Schwanke pointed out that in the asset purchase agreement Employer did not assume any liabilities relating to workers' compensation claims which arose on or before February 5, 1993.[3] Schwanke Deposition at 24–25; R.R. at 237a–238a.[4]

The WCJ granted Claimant's petition for benefits and also ordered Employer to pay reasonable and necessary litigation costs incurred by Claimant. The WCJ also determined that Employer violated the Act and awarded a five percent penalty based upon the expenses paid by Employer not including the cost of Claimant's dinner. The WCJ found Claimant, Copeland, Perrong, Sebring, and Schwanke credible and made the following relevant findings of fact:

4. With regard to the preceding medical information, this Judge considers each to have been rendered within a reasonable degree of medical certainty by the respective medical experts. Nevertheless, on balance, this Judge finds the opinion of Dr. Miller that Claimant sustained a total binaural hearing loss of 12.18% to be both credible and persuasive. This finding is based, in part, on the thoroughness with which the doctor discussed his findings. Additionally and more importantly, however, is the fact that Dr. Miller did have at his disposal the various hearing tests performed on Claimant during the course of his employment with the Defendant/Employer, Bemis, or its predecessor companies that operated the facility in which Claimant worked. Given this fact, the doctor's ultimate conclusion that Claimant sustained a binaural impairment of 12.18% is accepted as fact for purposes of this Decision. The doctor's additional opinions with regard to the amount of hearing loss sustained by Claimant when employed by the Defendant/Employer, Bemis, shall be discussed at a further point in this Decision.

. . . .

11. .... This Judge also notes that, with regard to the Asset Purchase Agreement, while a valid contract between the Defendant/Employer and its predecessor, was not a contract negotiated between the Defendant/Employer and the employees through their union representation. Insofar as it was *not* a contract between the Defendant/Employer and Claimant's union, its language cannot be used as the sole basis for the Defendant/Employer to avoid liability for a workers' compensation claim. Additionally, and more importantly, the language of the Asset Purchase Agreement does not clearly address the situation posed by Claimant's claim. In par-

---

3. Section 4(b)(v)(A) of the Asset Purchase Agreement provided that Princeton remained liable for:

[t]he following claims related to employee or former employees of Seller [Princeton]: ... all liabilities incurred on or prior to the Closing Date (including medical expenses) resulting from workers' compensation claims brought by employees or former employees of Seller [Princeton], whether or not such employee or former employee is later employed by Purchaser [Employer].

4. There was little, if any, evidence submitted with respect to the penalty petition. Counsel for the parties agreed that Employer did not pay Claimant's travel expenses for an IME for some time. There was an issue whether Employer was responsible to pay for Claimant's meal expense.

ticular, it does not address a workers' compensation claim that was not, at the time of the Defendant/Employer's purchase of the Hazleton facility, known or fully materialized. In effect, Claimant, as of the 1993 purchase date, had, at best, only the potential for a claim for hearing loss benefits under the Workers' Compensation Act. The Asset Purchase Agreement only addressed liabilities for workers' compensation claims that were '... incurred on or prior to the closing date ...' ... Even if the Asset Purchase Agreement could be seen as a controlling document, it did not directly address the situation presented by Claimant's claim. Therefore, as previously indicated in this Analysis, it is concluded that Claimant's argument that the totality of the circumstances must be considered and, when doing so, that the Defendant/Employer shall be considered the successor employer and liable for Claimant's claim, is persuasive and is accepted. (Emphasis in original. Citation omitted).

WCJ's Decision, March 17, 2005, Findings of Fact Nos. 4 and 11 at 8 and 14.

Employer appealed to the Board and contended that the WCJ's findings were not supported by substantial evidence and that the WCJ erred when he determined that Employer was the successor-in-interest of the prior owner and was responsible for Claimant's hearing impairment. Claimant appealed the WCJ's determination that Employer's contest was reasonable.

The Board reversed as to Claimant's petition for benefits and affirmed as to the contest:

Upon review, we believe the Judge erred in imposing liability on Defendant [Employer] for any hearing loss Claimant sustained prior to Defendant's [Employer] acquisition of the facility. Because the Judge recognized that Claimant had sustained a hearing loss prior to his employment with Defendant [Employer], and because the last injurious exposure rule no longer applies in hearing loss cases, Defendant [Employer] could be liable for pre-employment hearing loss Claimant sustained only if, based on its acquisition of assets of the predecessor, Defendant [Employer] could be considered a successor-in-interest based on certain narrowly defined circumstances.... Because Defendant [Employer] did not acquire all the assets of Princeton, but only specified assets, the exception under which liability could be imposed on Defendant [Employer] as a successor-in-interest do not even apply.... Should we apply those rules, Defendant [Employer] could not be found liable as a successor-in-interest since the transaction was not a consolidation or merger, there is no issue of simple continuation of the selling corporation since not all the assets were purchased, there is no allegation of fraud, and there is no allegation of inadequate consideration.... Because Princeton continued to operate, there is neither precedent nor rationale to impose liability on Defendant [Employer] following its simple purchase of Princeton's assets, absent Defendant's [Employer] express assumption of Princeton's liabilities. Rather, any claims that existed as of the 1993 purchase date against Princeton may still be pursued against it. Therefore, the Judge erred in determining that Defendant [Employer] was the successor-in-interest of Princeton with respect to any hearing loss sustained by Claimant prior to the 1993 purchase date. While the Judge determined that the agreement did not exclude liability for Claimant's claim against Princeton as of 1993 because

that claim was only the potential for a claim and was not fully known or materialized, we reiterate that the legislature has determined that where a new employer establishes a pre-employment baseline, any such potential claims remain the responsibility of the former employer.... We will therefore reverse the Judge's Order granting Claimant's claim petition. (Citations omitted).

Board Opinion, January 9, 2006, (Opinion) at 8–10. The Board reversed the award of litigation costs because Claimant did not prevail.

Claimant contends that the Board erred when it reversed the WCJ's determinations of credibility and evidentiary weight with respect to the asset purchase agreement and that the Board erred as a matter of law when it reversed the WCJ's decision with respect to whether Employer was a successor-in-interest. Claimant further contends that the Board erred to the extent it overturned the WCJ's decision and determined that Claimant's hearing loss was not caused by Employer where no legally competent baseline audiograms established that the hearing loss predated employment with Employer, that the Board erred when it determined that Employer presented a reasonable contest with respect to the penalty petition, that the Board erred as a matter of law when it reversed the WCJ's award of litigation costs, and that the Board erred when it determined that Employer presented a reasonable contest with respect to the claim petition where the evidence presented was insufficient to show that Employer was not a legal successor to Princeton, and where Dr. Miller agreed that Claimant suffered hearing loss in the course of his employment.[5]

Initially, Claimant contends that the Board committed an error of law when it reversed the WCJ's determinations with respect to credibility and weight of the evidence regarding the asset purchase agreement. Claimant asserts that the Board made two errors. First, Claimant argues that the WCJ's determination that Claimant's situation was not governed by the Asset Purchase Agreement was based on the WCJ's credibility determinations and the weight the WCJ assigned to the evidence and should not have been reversed. Second, Claimant argues that the Board committed an error of law when it determined that Employer "simply" just purchased the assets of Princeton without assuming the liabilities and because Princeton continued to operate, there was neither precedent nor any reasonable basis not to impose liability on employer.

With respect to Claimant's first assessment of error, this Court disagrees. A review of the Board's opinion reveals that it did not disturb any of the WCJ's credibility determinations. Rather, the Board made a legal determination based on the facts found by the WCJ.

As part of Claimant's argument, Claimant asserts that the Board erred when it determined that Employer was not liable for Claimant's hearing loss because Employer purchased some of the assets of Princeton, but not all, and did not assume any liability for this claim petition. In *LTV Steel Company, Inc. v. Workers' Compensation Appeal Board (Mozena)*, 562 Pa. 205, 754 A.2d 666 (2000), our Pennsylvania Supreme Court addressed a similar situation. John Mozena (Mozena)

---

5. This Court's review is limited to a determination of whether an error of law was committed, whether necessary findings of fact are supported by substantial evidence, or whether constitutional rights were violated. *Vinglinsky v. Workmen's Compensation Appeal Board (Penn Installation)*, 139 Pa.Cmwlth.15, 589 A.2d 291 (1991).

worked at the same steel plant in Aliquippa from 1957 forward. When he commenced employment, the plant was owned by Jones & Laughlin Steel Corporation (J & L). By 1974, LTV Corporation (LTV) had acquired 100% of the stock of J & L and merged J & L into its operations and made it a wholly owned subsidiary of LTV. In 1978, LTV acquired Youngstown Sheet and Tube Steel Company and merged it with J & L in 1981. In 1981, LTV purchased Republic Steel and merged it with J & L and amassed all of the assets under the name of LTV Steel Company. On August 21, 1995, Mozena petitioned for benefits and alleged that he suffered a bilateral hearing loss as a result of his long-term exposure to occupational noise at the Aliquippa plant. *Mozena,* 562 Pa. at 209–210, 754 A.2d at 668. LTV presented the deposition testimony of attorney Mark Katz (Attorney Katz), the senior attorney at LTV, in an attempt to establish that from 1957 to 1973, Mozena worked for J & L and LTV was not liable for any pre–1974 injury to Mozena. Attorney Katz conceded that through stock sales which resulted in the total purchase of J & L in 1974, LTV assumed all assets and liabilities of J & L, including all workers' compensation claims which existed prior to 1974. The WCJ awarded benefits to Mozena and determined that he had worked for LTV from 1957, forward because LTV had assumed the liabilities of its constituent companies through merger. LTV appealed to the Board which affirmed. LTV petitioned for review with this Court. This Court affirmed. LTV then petitioned for allowance of appeal with our Pennsylvania Supreme Court. *Mozena,* 562 Pa. at 212–214, 754 A.2d at 670–671.

With respect to the issue of whether LTV was liable for any of Mozena's hearing loss before it acquired J & L in 1974, our Pennsylvania Supreme Court affirmed:

It is well established law in the Commonwealth that when corporations merge the surviving corporation succeeds to both the rights and liabilities of the constituent corporation. . . . If we allowed a surviving company to deny responsibility for hearing loss caused by its predecessor, we would be sanctioning corporate restructuring as a means of escaping liability. We agree with the Commonwealth Court that such a result would not advance the humanitarian objectives of the Act. (Citations omitted).

*Mozena,* 562 Pa. at 225–226, 754 A.2d at 677.

This Court applied *Mozena* in *LTV Steel Company v. Workers' Compensation Appeal Board (Bleigh),* 758 A.2d 749 (Pa. Cmwlth.2000). Frederick Bleigh (Bleigh) had petitioned for benefits and alleged that he sustained a binaural hearing loss caused by exposure to noise in the course of his employment with LTV Steel Company (LTV). Bleigh had commenced his employment with J & L at its Aliquippa plant in 1956, and continued to work there. As in *Mozena,* Attorney Katz testified about the corporate structure, history, and organization of LTV. The WCJ found Attorney Katz credible and determined that Bleigh had been employed by one employer for purposes of the Workers' Compensation Act since 1956. The WCJ awarded benefits. LTV petitioned for review with this Court which followed *Mozena* and affirmed.

Here, the WCJ found credible the testimony of Sebring that Employer purchased the assets and not the liabilities of Princeton. The WCJ also found credible Schwanke's testimony that Employer purchased certain assets of Princeton including the plant where Claimant worked but did not purchase any of Princeton's stock and that Employer specifically excluded

workers' compensation liabilities that arose prior to the purchase of the assets. The WCJ further cited the provision in the asset purchase agreement which specifically excluded liabilities which were incurred on or prior to the closing date relating to workers' compensation claims brought by employees or former employees of Princeton regardless of whether the employee became employed by Employer. Unlike the situations in *Mozena* and *Bleigh*, Employer did not purchase the stock of Princeton rather it purchased certain assets. *Mozena* and *Bleigh* are distinguishable from the present controversy on this basis.

A claimant who seeks compensation benefits for a loss of hearing must establish a permanent hearing loss of ten percent or greater that is medically proven to be work-related and caused by exposure to occupational noise. Section 306(8)(iii) of the Act, 77 P.S. § 513(8)(iii). Pursuant to Section 306(c)(8)(i) of the Act, 77 P.S. § 513(8)(i), the claimant must also establish that the claim was timely filed by showing that he was exposed to occupational noise while working for the employer during the three years preceding the claim. *Meadville Forging Company v. Workers' Compensation Appeal Board (Artman)*, 747 A.2d 958 (Pa.Cmwlth.), *petition for allowance of appeal denied*, 564 Pa. 698, 764 A.2d 52 (2000).

Section 306(c)(8)(vi) of the Act, 77 P.S. § 513(8)(vi), provides:

An employer shall be liable only for the hearing impairment caused by such employer. If previous occupational hearing impairment or hearing impairment from non-occupational causes is established at or prior to the time of employment, the employer shall not be liable for the hearing impairment so established whether or not compensation has previously been paid or awarded.

In *USX Corporation v. Workers' Compensation Appeal Board (Rich)*, 727 A.2d 165 (Pa.Cmwlth.1999), this Court interpreted Section 306(c)(8)(vi):

Because of the inclusion of the phrase 'at or prior to the time of employment,' [in Section 306(c)(8)(vi)] a more reasonable interpretation is that this provision simply dispenses with the 'last injurious exposure rule' that the last employer with which [a] claimant is employed and is cumulatively exposed to hazardous occupational noise is responsible for all work-related loss of hearing throughout the claimant's working life, not just for the hearing loss caused by his employment with that specific employer. In order for an employer not to be responsible for a hearing impairment under [Section 306(c)(8)(vi)], it must prove that the non-occupational cause of hearing loss ... was present at or prior to the time of employment. (Citation omitted).

*Rich*, 727 A.2d at 166–167.

In *Anchor Hocking Packaging Company v. Workers' Compensation Appeal Board (Martin)*, 735 A.2d 157 (Pa.Cmwlth. 1999), this Court extended the *Rich* analysis to a situation involving two potential employers, Anchor Hocking and Anchor Hocking Packaging Company. Although *Anchor Hocking* is distinguishable from the present controversy because there was no evidence presented that described the acquisition of the plant where Gary L. Martin (Martin) worked, this Court's reasoning is instructive:

Although *Rich* dealt specifically with non-occupational hearing loss, the above reasoning is equally applicable when an employer attempts to avoid responsibility for previous work-related hearing loss.

Even if Employer [Anchor Hocking Packaging Company] here is a 'new em-

ployer,' ... then it would still be required to establish that at or prior to employment with it, Claimant [Martin] suffered from previous occupational hearing loss with a previous employer. In other words, Employer [Anchor Hocking Packaging Company], and not Claimant [Martin], would be required to show that prior to 1992, the date Employer [Anchor Hocking Packaging Company] alleges that it became Claimant's [Martin] new Employer, Claimant [Martin] suffered previous occupational hearing loss attributable to some prior employer. Employer [Anchor Hocking Packaging Corporation] introduced no such evidence, but merely offered the opinion of Dr. Busis, which was rejected by the WCJ, who believed that none of Claimant's [Martin] hearing loss was directly attributable to exposure to hazardous occupational noise. Because Employer [Anchor Hocking Packaging Company] did not meet its burden of establishing the percentage of Claimant's [Martin] hearing loss that was attributable to a prior employer, the Board and WCJ did not err in finding Employer [Anchor Hocking Packaging Company] and its insurer, Zurich as responsible parties for Claimant's [Martin] work-related hearing loss. (Footnote omitted).

*Anchor Hocking,* 735 A.2d at 160.

Here, the WCJ accepted Dr. Miller's testimony that Claimant suffered a binaural hearing loss of 12.18% and that he had a pre-existing hearing loss of 6.25% when Employer took over operations at the plant. Dr. Miller reasoned that Claimant's hearing loss attributable to Employer was only 5.93% which was below the 10% threshold set forth in the Act. Therefore, in order for Employer to be liable for Claimant's hearing loss, Employer had to be a successor-in-interest to Princeton, assuming there was no problem with the audiograms. The Board applied the standard set forth by our Pennsylvania Supreme Court in *Continental Insurance Company v. Schneider, Inc.,* 582 Pa. 591, 873 A.2d 1286 (2005) to determine whether Employer was a successor-in-interest to Princeton. In *Continental,* our Pennsylvania Supreme Court determined:

> With respect to successor liability in this Commonwealth, it is well-established that 'when one company sells or transfers all of its assets to another company, the purchasing or receiving company is not responsible for the debts and liabilities of the selling company simply because it acquired the seller's property.'... This general rule of non-liability can be overcome, however, if it is established that (1) the purchaser expressly or implicitly agreed to assume liability, (2) the transaction amounted to a consolidation or merger, (3) the purchasing corporation was merely a continuation of the selling corporation, (4) the transaction was fraudulently entered into to escape liability, or (5) the transaction was without adequate consideration and no provisions were made for creditors of the selling corporation.... (Footnote and citations omitted).

*Continental,* 582 Pa. at 599–600, 873 A.2d at 1291.

■ Although *Continental* was not a workers' compensation case, it is instructive when determining whether Employer was a successor-in-interest to Princeton and liable for Claimant's hearing loss. Employer expressly did not agree to assume liability for workers' compensation payments and, in fact, the asset-purchase agreement specified that Employer did not assume any of Princeton's liabilities relating to workers' compensation. There is nothing in the record to indicate that the transaction was any type of consolidation

or merger and, further, it is clear from the record that Employer was not a continuation of Princeton, there was neither an allegation that the transaction was fraudulent, nor was there an allegation of inadequate consideration. This Court agrees with the Board that Employer was not a successor-in-interest to Princeton.[6]

Claimant next contends that the Board erred as a matter of law when it reversed the WCJ's decision with respect to Employer as a successor-in-interest. Claimant argues that because the sale of productive assets took Princeton out of business in the Commonwealth of Pennsylvania, the business operation continued without substantial interruption, the products and contracts were the same before and after the sale, and virtually all personnel were the same before and after the sale, there was no question that Employer was the successor to Princeton. While this Court is cognizant of Claimant's legal argument, this Court believes the Board employed the correct analysis and did not err.

Claimant next contends that the Board erred when it reversed the WCJ and determined that Claimant's hearing loss was not caused by Employer where no legally sufficient baseline audiograms established any hearing loss that predated Claimant's employment with Employer. Claimant asserts that Employer did not introduce into evidence any audiograms which were taken in accordance with OSHA standards.

Section 306(c)(8)(iv) of the Act, 77 P.S. § 513(8)(iv), provides "[t]he percentage of hearing impairment for which compensation may be payable shall be established solely by audiogram. The audiometric testing must conform to OSHA Occupational Noise Exposure Standards, 29 CFR 1910.95 (relating to occupational noise ex-

posure) and Appendices C, D, and E to Part 1910.95 (July 1, 1994)."

In *Wheeling–Pittsburgh Steel Corporation v. Workers' Compensation Appeal Board (Sesco)*, 828 A.2d 1189 (Pa.Cmwlth. 2003), *petition for allowance o appeal denied*, 581 Pa. 694, 864 A.2d 531 (2004), this Court affirmed the Board's affirmance of the WCJ's decision to reject a pre-employment audiogram which did not meet OSHA standards: "Because the Act requires that the WCJ consider only those audiograms that meet OSHA standards when determining whether Claimant [John Sesco] sustained a hearing loss due to exposure to hazardous occupational noise, we cannot conclude that the WCJ erred in disregarding the results of the 1971 audiogram conducted by Employer [Wheeling–Pittsburgh Steel Corporation]." *Wheeling–Pittsburgh*, 828 A.2d at 1194.

At the earliest time possible, Claimant raised the issue of whether the audiogram performed while Claimant was still employed by Princeton complied with OSHA standards in his brief to the WCJ. While the WCJ made no finding on this point, the Court notes there was no need because the WCJ believed that Employer was a successor-in-interest to Princeton. In any event, a review of the record indicates that there is nothing in the record to substantiate that the audiogram was OSHA compliant. Dr. Miller's reference to the audiogram conducted prior to Employer's assumption of control of the plant did not indicate whether the audiogram complied with OSHA standards. Under the Act, an audiogram must conform to OSHA standards.

Under *Anchor Hocking*, it is the employer's burden to establish that there was an occupational hearing loss attribut-

---

**6.** Claimant looks to federal labor law for support of his theory that the totality of circumstances determines whether a new employer is a successor-in-interest.

able to a previous employer. Employer attempted to establish this through the audiogram conducted shortly before Employer assumed control of the plant. However, as Claimant points out, Employer failed to establish that this audiogram complied with OSHA standards. Therefore, Employer failed to establish an occupational hearing loss attributable to a previous employer. The Board did not address this issue probably for two reasons. First, the medical evidence was presented through the use of reports so there was no opportunity for Claimant to object to Dr. Miller's reliance on the audiogram on the ground it did not comply with OSHA standards. Second, Claimant did not need to raise the issue on Employer's petition to the Board because he prevailed before the WCJ. While the WCJ accepted Dr. Miller's testimony that Claimant suffered an occupational binaural hearing loss of 12.18%, Employer failed to shoulder its burden and establish that there was hearing loss prior to its acquisition of Princeton's assets. The Board erred. Employer is liable to pay Claimant's benefits [7] under the Act.[8]

Claimant next contends that the Board erred when it determined that Employer's contest with respect to the penalty petition was reasonable. Claimant asserts that the WCJ failed to determine whether Employer's contest was reasonable. A review of the WCJ's decision reveals that the WCJ found that Employer's contest was reasonable with respect to the claim petition. Claimant is correct that the WCJ made no determination with respect to whether the contest was reasonable regarding the penalty petition. The Board determined, "Because Defendant [Employer] was not responsible for the cost of Claimant's dinner, and because we see no indication that the parties presented any witnesses to litigate the Penalty Petition, we cannot agree the Judge erred in determining that Defendant's contest was reasonable with respect to the Penalty Petition." Board Opinion at 12. Section 440 of the Act, 77 P.S. § 996, provides that when a claimant prevails he is entitled to costs unless the employer's contest was reasonable. Here, Claimant petitioned for penalties on the basis that Employer did not pay Claimant's travel expenses to attend an IME. Employer challenged whether it was responsible to pay for a meal for Claimant. The WCJ agreed with Employer that it did not have to pay for this meal. At least to that extent, Employer's contest was reasonable. Further, as Employer points out in its brief, even if Employer's contest was unreasonable with respect to the penalty pe-

---

7. In sum, the WCJ awarded benefits on the basis that there was essentially just one employer. This Court reaches the same result but on different grounds. This Court concludes that Employer was the only employer because the audiogram conducted prior to Employer's assumption of Princeton's assets did not comply with OSHA standards as required under the Act.

8. Employer argues that Claimant waived this argument. This Court does not agree. Contrary to Employer's contention that Claimant failed to raise this issue before the WCJ, a review of the record reveals that Claimant raised the issue in his letter-brief to the WCJ. Employer further argues that there is no evi-

dence that either the audiogram conducted by Dr. Miller or the audiogram conducted by Dr. Akbar met OSHA standards so that Claimant failed to meet his burden of proving an occupational hearing loss. While Employer raised this issue before the WCJ with respect to Dr. Akbar, it did not with respect to its own expert. The WCJ found Dr. Miller's determination that Claimant suffered a hearing loss of 12.18% credible. By not raising the issue of whether its own expert's audiogram was legally sufficient, Employer waived this issue. *See USX Corp. v. Workers' Compensation Appeal Board (Labash)*, 788 A.2d 1101 (Pa. Cmwlth.2001), *petition for allowance of appeal denied*, 569 Pa. 696, 803 A.2d 737 (2002).

tition, Claimant's counsel failed to provide the WCJ with litigation expenses relating to the penalty petition, so the WCJ had nothing upon which to base an award. This Court finds no error.

■ Claimant next contends that the Board committed an error of law when it reversed the WCJ's award of litigation costs. The Board made this determination on the basis that Claimant did not prevail on his claim petition. Because this Court has determined that Claimant does prevail on his claim petition, this Court agrees with Claimant that he is entitled to litigation costs. In order for a claimant to be awarded litigation costs, the claimant must prevail on the particular issue or petition for which he seeks costs. *Jones v. Workers' Compensation Appeal Board (Steris Corporation)*, 874 A.2d 717 (Pa.Cmwlth. 2005).

■ Finally, Claimant contends that the Board erred when it determined that Employer presented a reasonable contest. Once again, a prevailing claimant is entitled to costs including attorney's fees unless the employer's contest was reasonable. Because Employer's contest was not based on an OSHA approved audiogram as required by the Act, this Court agrees with Claimant that Employer's contest was not reasonable.

Accordingly, this Court affirms in part and reverses in part. This Court affirms with respect to the determination that Employer was not a successor-in-interest to Princeton and that Employer's contest of the penalty petition was reasonable. This Court reverses the determinations that 1) Employer established Claimant had a hearing loss which predated Employer's assumption of the assets of Princeton, 2) that Claimant was not entitled to litigation costs, and 3) that Employer's contest of the claim petition was reasonable.

### ORDER

AND NOW, this 11th day of August, 2006, the order of the Workers' Compensation Appeal Board in the above-captioned matter is affirmed in part and reversed in part. This Court affirms with respect to the determination that Bemis Company, Inc. was not a successor-in-interest to Princeton Packaging Holdings, Inc. and that Bemis Company, Inc.'s contest of the penalty petition was reasonable. This Court reverses with respect to the determinations that Bemis Company, Inc. established that Edward Hayduk had a hearing loss which predated Bemis Company, Inc.'s assumption of the assets of Princeton Packaging Holdings, Inc., that Edward Hayduk was not entitled to litigation costs, and that Bemis Company, Inc.'s contest of the claim petition was reasonable.