JLG Industries, Inc.,
                Petitioner

v.

Workers' Compensation Appeal
Board (Mundorff),
                Respondent

:
:
:
:
:   No. 1262 C.D. 2017
:   SUBMITTED: February 9, 2018
:
:
:
:

BEFORE:    HONORABLE P. KEVIN BROBSON, Judge
              HONORABLE ANNE E. COVEY, Judge
              HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
BY JUDGE CEISLER               FILED: April 18, 2018

JLG Industries, Inc. (Employer) petitions for review of the August 24, 2017 Order of the Workers' Compensation Appeal Board (Board), that affirmed the decision of a workers' compensation judge (WCJ) granting the claim petition of Matthew Mundorff (Claimant) and awarding benefits for wage loss and medical costs. We affirm in part and reverse in part.

## **Background**

Claimant began working for Employer in 1993 as a machine assembler. Notes of Testimony (N.T.), 5/6/15, at 14-15. On September 26, 2012, Claimant was working beneath a tail light assembly when he hit the top of his head and he was knocked to the floor. *Id.* at 16-17. This incident was witnessed by a co-worker, and Claimant reported it to his supervisor, Jared Crawford, and Victor Watkins, Mr. Crawford's supervisor. *Id.* at 17-18. Claimant did not seek medical treatment for

approximately one month after the incident, at which point Claimant went to the office of his primary care physician, Dr. Henry W. Shoenthal. N.T., 5/6/15, at 19. Dr. Shoenthal's physician assistant, Ronald Fetsko, examined Claimant and recommended physical therapy and pain treatment. N.T., 5/6/15, at 19-21. Claimant worked until December 3, 2012, at which point Mr. Fetsko advised Claimant that he could no longer work. *Id.* at 28.

On April 9, 2015,[1] Claimant applied for workers' compensation (WC) benefits for the September accident. Reproduced Record (R.R.) at 3a. Employer issued a Notice of Compensation Denial (NCD) on November 7, 2012. N.T., 5/6/15, Ex. J-1. The NCD indicated Employer was notified of the injury on November 1, 2012, and Claimant's alleged injury was a laceration to his skull. *Id.* Employer declined to pay WC benefits to Claimant because its investigation failed to show that Claimant sustained a work-related injury or disability. *Id.* On November 14, 2012, Employer issued a corrected NCD indicating Claimant alleged a contusion to his skull. N.T., 5/6/15, Ex. J-2. Employer once more declined to pay for WC benefits for the same reasons iterated in its first NCD. *Id.*

Claimant applied for and received short-term and long-term disability payments through March 2015. *Id.* at 29-30.[2]

---

[1] The record indicates that Claimant "did the paperwork for Workers' Comp," but Claimant did not formally file for WC benefits until 2 ½ years after the work incident. N.T., 5/6/15, at 38. There is nothing in the record which explains what this paperwork was or where it was filed. According to the record, a claim petition was not filed until April 9, 2015. R.R. at 3a. Claimant collected disability benefits until March 2015 and then filed for WC approximately one month after his disability ran out. N.T., 5/6/15, at 30.

[2] The record does not indicate exactly when Claimant began receiving disability benefits and when and why Claimant received both long- and short-term disability benefits.

2

Over the next several years, in addition to treatment received through Dr. Shoenthal's office, Claimant was examined and treated by multiple medical professionals, including two neurologists, Drs. Burke and Clark, and Employer's physician, Dr. Milroth. N.T., 5/6/15, at 20-23. Specifically, Claimant received physical therapy and pain management for his thoracic spine at the T3 and T4 vertebrae. *Id.* at 20-24. Dr. Shoenthal released Claimant to return to work with restrictions in January 2014, and Claimant returned to work for Employer that month.[3] *Id.* at 29. Initially, Employer provided Claimant a light-duty position. *Id.* However, after approximately one week, Employer required Claimant to perform heavy-duty work that Claimant alleged aggravated his condition. *Id.* Approximately one month later, Claimant again stopped working at Mr. Fetsko's recommendations. *Id.* at 28.

On April 9, 2015, Claimant filed a claim petition, claiming total disability as a result of injuries to his thoracic spine, including but not limited to, compression fractures at the T-3, T-4, and T-12 levels. R.R. at 3a. Employer filed its answer on April 14, 2015, denying Claimant suffered a workplace injury as alleged. R.R. at 7a. A hearing before the WCJ was held on May 6, 2015. On November 11, 2016, the WCJ issued a decision granting Claimant's Claim Petition and awarding Claimant total temporary disability benefits for medical expenses and wage loss

---

[3] Claimant testified he was released to return to work in January 2014 and he returned to work a year later in January 2015. N.T., 5/6/15, at 28-29. The WCJ's decision notes January 2015 as the date Claimant returned to work. WCJ Decision, Finding of Fact (F.F.) No. 6(s). Based on the timeline provided in the testimony of Robert Rundorff, M.D. (Dr. Rundorff), a physician employed by the long-term disability carrier, this appears to be an error and Claimant returned to work in January 2014. Claimant's testimony appears to be an error for the following reasons: Dr. Rundorff performed an independent medical exam (IME) of Claimant on August 11, 2014. N.T., 5/6/15, Ex. C-2 at 1. Dr. Rundorff's IME report references January 2014 as the timeframe in which Claimant was released and returned to work. *Id.*

beginning December 3, 2012, and thereafter. Employer appealed to the Board, which affirmed the WCJ on August 24, 2017. This appeal followed.

## Issues

On appeal, Employer argues that the findings of the WCJ are unsupported by substantial evidence and the WCJ improperly applied the burden of proof. Employer also argues the medical evidence presented by Claimant, and relied upon by the WCJ, was equivocal and incompetent.[4]

## Discussion

Before addressing Employer's asserted errors, it is instructive to first set forth the evidence presented before the WCJ by both parties.

A hearing before the WCJ occurred on May 6, 2015, wherein Claimant testified on his own behalf. *After* this hearing, Claimant presented to the WCJ the deposition testimony of two of his treating physicians, Dr. Shoenthal and P. James Ridella, M.D. (Dr. Ridella), and Dr. Rundorff, a physician employed by the long-term disability carrier. Employer presented the deposition testimony of its medical expert, William Abraham, M.D. (Dr. Abraham).[5]

At the hearing Claimant testified to the following: Claimant stated that he delayed seeking treatment for nearly a month after the September 26, 2012 work

---

[4] Our review is limited to determining whether an error of law was committed, whether necessary findings of fact are supported by substantial evidence, and whether constitutional rights were violated. *DeGraw v. Workers' Comp. Appeal Bd. (Redner's Warehouse Mkts., Inc.)*, 926 A.2d 997, 999 n.2 (Pa. Cmwlth 2007). Substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion. *Hoffmaster v. Workers' Comp. Appeal Bd. (Senco Prods., Inc.)*, 721 A.2d 1152, 1155 (Pa. Cmwlth. 1998). In performing a substantial evidence analysis, this Court must view the evidence in a light most favorable to the party who prevailed before the factfinder. *Id.*

[5] The only documents entered into evidence by Claimant or Employer at the May 2015 hearing were the fee agreement, Dr. Rundorff's IME report, and Dr. Shoenthal's office notes.

4

incident because his condition worsened. N.T., 5/6/15, at 18. Following an examination by Mr. Fetsko, Claimant was referred to several treatment providers.[6] His treatment generally consisted of physical therapy, and pain medication, both oral and by means of injections, as well as multiple injections of steroids and Botox. *Id.* at 20-24. As of the hearing date, Claimant was taking Percocet and using Fentanyl patches for pain management, trimethazone and Prilosec to treat side effects from the pain medications, and Xanax for depression. *Id.* at 25-26. Claimant testified the Xanax was prescribed for depression caused by his pain. *Id.* at 27. He denied having mental health issues prior to the September 26, 2012 work incident. *Id.* He continues to treat with Dr. Shoenthal's office once per week for injections.[7] *Id.* at 39.

Claimant acknowledged having suffered a prior back injury at work in 1994, as well as having "several problems in the lower back," but denied having any problem with his thoracic spine before the September 26, 2012 work incident. N.T., 5/6/17, at 31, 40. Claimant testified that the Family and Medical Leave he used in May and June of 2012 was related to a hernia operation. *Id.* at 35. Claimant denied taking any medications prior to the September 26, 2012 work incident. *Id.* at 36.

As to his current physical activity, Claimant testified he lives on a farm that has ducks, chickens, and goats. N.T., 5/6/15, at 43. His duties on the farm are limited and focus on supervising his children and "making sure they run it right." *Id.* Claimant went hunting after Thanksgiving 2012 and has kept up his hunting

---

[6] Claimant identified several additional treatment providers: Corrective Therapy Solutions and Health South for physical therapy, Lighthouse Medical for pain medication and steroid injections, UPMC in Bedford for unspecified tests, Conemaugh Physicians Group for MRIs, and a Dr. Nassr with Conemaugh Neuro Surgical Associates. N.T., 5/6/15, at 20-23.

[7] Claimant did not specify the type of injections administered.

5

license since then. *Id.* at 36-37. Claimant testified he only hunts for a day or two so he "can take the kids out" and described this activity as minimal. *Id.* at 37.

Claimant further presented the November 24, 2015 deposition testimony of Dr. Shoenthal to the WCJ. In preparation for his deposition, Dr. Shoenthal reviewed Claimant's medical records compiled by his office, including his treatment for Claimant's prior accidents and ongoing lower back problems, as well as records from the other physicians to whom Claimant was referred for treatment.

According to Dr. Shoenthal, he first began treating Claimant at his office in June 2008 for medical issues that do not appear related to work injuries. N.T., 11/24/15, at 9. Claimant was seen in his office for lower back pain in June 2009, August 2010, and October 2011. *Id.* at 10. Claimant was also treated in Dr. Shoenthal's office for mid-back pain in December 2011 after falling from an ATV in October. *Id.* at 11.[8]

On October 26, 2012, Claimant went to Dr. Shoenthal's office for the September work-related injury, and was evaluated by Mr. Fetsko. N.T., 11/24/15, at 12. Claimant reported to Mr. Fetsko that most of his pain was in the neck and upper back. *Id.* Upon examination, Claimant had tenderness in his upper thoracic spine. *Id.* At that time, Claimant was referred for physical therapy, prescribed a muscle relaxant, and sent for x-rays of the neck and thoracic spine. *Id.* at 13.

After the October 26, 2012 post-accident medical evaluation with Mr. Fetsko, Claimant treated with Dr. Shoenthal's practice approximately fifty or sixty times for pain related to his thoracic spine. *Id.* at 15-16. On March 27, 2015, Dr. Shoenthal and Mr. Fetsko prepared a medical report for Claimant's counsel which summarized

---

[8] Claimant underwent an MRI of his thoracic spine in November 2012 and the report found no evidence of edema/swelling. N.T., 11/2/15, at 18. Whether or not Dr. Shoenthal actually reviewed this November 2012 MRI report, or relied upon it in forming his opinions, is not clear from the record.

the September 26, 2012 work incident, the diagnostic tests taken after the incident, and various treatments provided. *Id.*, Ex. 3. The report indicated Claimant was diagnosed with head, cervical, and thoracic trauma with secondary intractable pain and imposed work restrictions. *Id.*

Based on this review, Dr. Shoenthal testified that Claimant's problems affecting his thoracic spine related to "the T3 and 4 fracture." N.T., 11/24/15, at 20. As to whether those fractures were caused by the September 26, 2012 work incident, Dr. Shoenthal testified it would be *"tough to relate the two without actually having seen the fall. The head injury would make you think it was more head or neck problems. The back could have come from the fall." Id.* at 21 (emphasis added). Dr. Shoenthal concluded that, as Claimant's x-rays from the December 2011 ATV accident showed nothing wrong with the thoracic spine, the "two could go together, the [September 26, 2012] accident and the pain." *Id.* Dr. Shoenthal reviewed his March 27, 2015 medical report and, beyond noting that Claimant's medical restrictions had changed since the date of the report,[9] he confirmed its substance as accurate. *Id.* at 23.

Claimant further presented to the WCJ the May 24, 2016 deposition testimony of Dr. Ridella. According to Dr. Ridella, Claimant was referred to him by Mr. Fetsko. N.T., 5/24/16, at 11. On October 21, 2015, three years after the fact, Dr. Ridella first examined Claimant for the work-related injury. *Id.* at 14. Dr. Ridella acknowledged that a three-year-old back injury can be "difficult to put together" and ordered a bone scan and MRI. *Id.* at 14-15. Dr. Ridella did not find evidence of a compression fracture. *Id.* at 15. He further recognized that other treatment providers

---

[9] The March 27, 2015 report indicated Claimant was not capable of working in any capacity and could not lift, push, or pull anything over five pounds. N.T., 5/6/15/, Ex. C-3. By the date of his deposition, Dr. Shoenthal believed Claimant was capable of light-duty work but that lifting more than twenty pounds would aggravate his back pain. N.T., 11/24/15, at 22.

"could not come to a conclusion that there was anything going on," but regarded these inconclusive findings understandable "three years after the fact." *Id.* Dr. Ridella testified that, if Claimant had a compression fracture, it was healed by the time he examined Claimant. *Id.* at 17.

Dr. Ridella treated Claimant's pain with epidural injections, which caused Claimant to "jump[]" when they were administered to his third and fourth thoracic joints. *Id.* at 16-17, 19. Dr. Ridella testified that Claimant was sedated at the time and had no control of his actions except for reflex response, indicating something affected him. *Id.* Claimant's reaction during the injections led Dr. Ridella to conclude Claimant had "facet joint arthritis or injury around the T-4 area." *Id.* at 20. Dr. Ridella opined, within a reasonable degree of medical certainty, that Claimant had joint arthritis or an injury around the T-4 level that was caused by his September 2012 work accident, as it made "the most sense" and the "mechanism of injury [was] fairly clear." N.T., 5/24/16, at 20-22.

The Claimant further presented the November 2, 2015 deposition testimony of Dr. Rundorff, who examined Claimant at the behest of Claimant's long-term disability carrier. N.T., 11/2/15, at 7. On August 11, 2014, Dr. Rundorff performed a physical exam of Claimant and reviewed Claimant's medical records. *Id.* at 9. In his IME report, Dr. Rundorff stated that the T-12 fracture was "documented on the thoracic spine MRI performed on 5/10/13." N.T., 5/6/15, Ex. C-2, at 2.

In formulating his opinions for his deposition, Dr. Rundorff also reviewed Dr. Shoenthal's office notes, the report of Dr. Abraham, a November 2012 MRI report that did not reveal any edema/swelling in Claimant's thoracic spine, as well as a May 10, 2013 MRI report that revealed the presence of compression fractures in the thoracic region of the spine. N.T., 11/2/15, at 9, 12. Per Dr. Rundorff's deposition testimony, based on his review of Claimant's medical records and his physical

8

examination of Claimant, Dr. Rundorff diagnosed Claimant with T-3, T-4, and T-12 compression fractures. *Id.* at 10.

In his deposition, Dr. Rundorff testified that his review of these additional medical records did not change his earlier opinion and they supported a finding that Claimant had "compression fractures at the level of the thoracic spine." N.T., 11/2/15, at 14. Dr. Rundorff acknowledged that the November 2012 MRI report found no evidence of edema/swelling, however, he opined that its absence would not "exclude a fresh or new fracture." *Id.* at 18. Dr. Rundorff was also aware that Claimant had suffered a prior work-related injury to his lower back in 1994,[10] but attributed the compression fractures to the September 26, 2012 work accident. *Id.* at 10, 18. Claimant did not report any other injuries to Dr. Rundorff, such as the October 2011 ATV accident. *Id.* at 18.

Employer offered the deposition testimony of Dr. Abraham. Dr. Abraham examined Claimant on June 17, 2015 and reviewed Claimant's medical records. N.T., 1/26/15, at 7-8. He concluded there were no objective findings to support Claimant's complaints of pain. *Id.* at 10-11. Employer's counsel asked Dr. Abraham if, within a reasonable degree of medical certainty, Claimant suffered a disabling work injury. *Id.* at 14. Dr. Abraham responded as follows:

> Well, I thought that, although I can't deny the history that
> [Claimant] – if you looked at it on the surface and say,
> well, could you hypothesize an injury having occurred on
> that particular date? I looked at the treatment records
> surrounding the time of this gentleman's injury, during

---

[10] The record does not indicate whether any of his other treating doctors, including Dr. Shoenthal, were aware of this 1994 back injury besides the references by Dr. Rundorff. Claimant testified he had a back injury in 1994 and he was off work for about a year. N.T., 5/6/15, at 31. At that time, he went back to work with restrictions, then "eventually" went back to full-duty. *Id.* at 31-32. Claimant does not name the treating physician.

9

which he was able to – excuse me – the time of this event, during which he was able to continue to work his full and unrestricted duty job; and as a result of the fact that this gentleman didn't treat for weeks and was working his regular job, I could not reasonably conclude that an injury occurred.

*Id.*

In essence, when asked directly if Claimant had suffered a work-related injury, Dr. Abraham opined that Claimant had not, because he did not seek immediate medical treatment and continued to work for a few months thereafter.

Claimant's counsel asked Dr. Abraham to look once more at an October 2015 CT scan that identified an older T-4 compression fracture. Dr. Abraham responded:

> Again, I understand the English language that you're looking at and I'm telling you that the radiologist is interpreting this in the context of the history of this patient having had a fracture. And if you – and what I'm – what I'm trying to point out is if we had given the radiologist a different history – and again, this is purely speculation and it doesn't – you know, if I change that history and I put it in front of the radiologist, no history of trauma, he might conclude that there's a potential that this patient may have had a compression fracture in the past, but he would not be speaking in absolute terms because there are other potential causes for those types of deformities. And so I think that – again, it's speculation, but if you give the radiologist the wrong information and they'll arrive at the wrong conclusion.
>
> And if you're going to suggest that this radiologist was capable of determining that this gentleman had a fracture based on information that's three years old and – and no opportunity to review the studies, then I – then I would say that I – I – there's – I – I respect you, but I can't arrive at that conclusion myself.

N.T., 1/26/15, at 36-37.

10

A request by Claimant's counsel for clarification as to whether Dr. Abraham believed Claimant's CT scan indicated a T-4 compression fracture resulted in another convoluted response, during which Dr. Abraham questioned whether the radiologist's findings would have changed had he been provided with a different medical history. N.T., 1/26/15, at 38-39. Earlier in his testimony, Dr. Abraham stated there was "no evidence [Claimant] had a fracture." *Id.* at 32. He later testified the "deformity" he saw on Claimant's x-rays could be compatible with a T-4 compression fracture, but "[he] could give [] other explanations." N.T., 1/26/15, at 39.

In his decision, the WCJ credited Claimant's testimony as to the occurrence of the injury and the steps Claimant took to report the injury to his supervisor. WCJ Decision, F.F. No. 17-18. The WCJ also found credible the testimony of Dr. Shoenthal, Dr. Rundorff, and Dr. Ridella, and explicitly discredited the testimony Dr. Abraham. *Id.*, FF. Nos. 19-20.

## A. Substantial Evidence

Employer first argues that the WCJ's findings are not supported by substantial evidence.[11] Employer contends the testimony presented by Claimant's medical experts was equivocal and the record lacked sufficient, competent evidence to support a finding that Claimant suffered a work injury. Employer highlights prior incidents in which Claimant **could** have injured his thoracic spine, including an October 2011 accident in which Claimant fell from an ATV and sought treatment for lower back pain. N.T., 11/24/15, at 10-11. Employer further points to various activities in which Claimant was engaged, such as hunting and operating a farm, as evidence Claimant is not disabled as alleged.

---

[11] Claimant declined to file a responsive brief.

In arguing that Claimant's medical testimony is incompetent, Employer relies on our Supreme Court's decision in *Newcomer v. Workmen's Compensation Appeal Board (Ward Trucking Corp.)*, 692 A.2d 1062 (Pa. 1997). The pertinent facts of *Newcomer* are as follows. The claimant was injured in a workplace accident which resulted in a perforated bowel, as well as torn stomach and chest muscles. *Id.* at 1062-63. Two years later, the claimant applied for reinstatement of total disability benefits on the basis of shoulder discomfort, which claimant alleged was caused by the workplace accident. *Id.* at 1063. The claimant's medical expert testified he believed the shoulder pain was caused by the workplace injury. *Id.* However, that medical expert had not reviewed any of the hospital records relating to the original injury and had not been involved in any of the claimant's prior treatment for the claimed injury. *Id.* The medical expert's opinion was based solely and expressly on the medical history provided by the claimant. *Id.* Further, his was the only expert opinion provided to establish a causal link between the claimant's injury and the original accident. *Id.* at 1066. Therefore, the Supreme Court reversed the grant of benefits to the claimant because the medical expert's testimony was based on a "false" medical history and, thus, was incompetent as a matter of law. *Id.* at 1064.

Relying on *Newcomer*, the Employer argues that both Dr. Ridella's and Dr. Rundorff's opinions relating to the cause of injury are incompetent as both of these opinions were formed with an incomplete medical history. Specifically, Employer claims that neither Dr. Ridella nor Dr. Rundorff knew that Claimant was involved in a prior ATV accident, nor were they aware of Claimant's extensive history of lower back pain.[12] Dr. Ridella was further unaware of the 1994 work injury. We find the Employer's reliance on *Newcomer* misplaced.

---

[12] The record is unclear as to whether Dr. Ridella was aware of Claimant's prior medical history and ongoing back problems prior to Claimant's September 26, 2012 work incident. Dr.

Generally, for a claimant to receive benefits, he must establish that his injury arose in the course of employment and the injury was causally connected to his employment. *Jeannette Dist. Mem'l Hosp. v. Workmen's Comp. Appeal Bd. (Mesich)*, 668 A.2d 249, 251 (Pa. Cmwlth. 1995). When the connection between the injury and work is not obvious, unequivocal medical testimony is necessary. *Chik-Fil-A v. Workers' Comp. Appeal Bd. (Mollick)*, 792 A.2d 678, 689 (Pa. Cmwlth. 2002). Medical testimony will be found unequivocal if the medical expert, after providing a foundation, testifies in his professional opinion that he believes a certain fact or condition exists. *Campbell v. Workers' Comp. Appeal Bd. (Pittsburgh Post-Gazette)*, 954 A.2d 726, 731 (Pa. Cmwlth. 2008). Medical testimony is equivocal and thus incompetent if, after a review of the medical expert's entire testimony, it is found to be based on mere possibilities. *Id*. at 730.

Where medical testimony is necessary to establish a causal connection, the medical expert must testify that, in his or her professional opinion, the result in question came from the assigned cause. *Odd Fellow's Home v. Workmen's Comp. Appeal Bd. (Cook)*, 601 A.2d 465, 469 (Pa. Cmwlth. 1991). However, there are no "magic words" that a doctor must recite to establish causation. *Id.* Furthermore, it is not necessary that the medical expert rule out with absolute certainty other factors that may have caused or contributed to a condition. *Campbell*, 954 A.2d at 730. The WCJ is the ultimate finder of fact and the exclusive arbiter of credibility and evidentiary weight. *LTV Steel Co., Inc. v. Workers' Comp. Appeal Bd. (Mozena)*, 754 A.2d 666, 676 (Pa. 2000). The WCJ is free to accept or reject, in whole or in part, the testimony of any witness. *Id.* As ultimate factfinder, the WCJ has exclusive

---

Ridella was unsure which of Claimant's medical records were provided to him. N.T., 5/26/16, at 25. While Dr. Ridella testified Claimant's counsel "gave him information," he related that to his knowledge "there were no other injuries at work." N.T., 5/24/16, at 27-28. However, we regard Employer's assertions as red herrings as Claimant's lower back injuries are irrelevant to Claimant's thoracic and cervical injuries.

authority to resolve conflicts in testimony. *Pa. Turnpike Comm'n. v. Workers' Comp. Appeal Bd. (Collins)*, 709 A.2d 460, 464 (Pa. Cmwlth. 1998). However, resolution of conflicting evidence cannot be supported by a mere announcement that the WCJ deemed one expert more credible and persuasive than another. *Daniels v. Workers' Comp. Appeal Bd. (Tristate Transport)*, 828 A.2d 1043, 1053 (Pa. 2003). Rather, there must be some articulation of the actual objective basis for the credibility determination. *Id.*

Here, the WCJ did not merely summarize the testimony of the medical witnesses and assign a credibility determination to each. Rather, the WCJ outlined the evidence presented by each witness and set forth his reasons for finding Claimant's witnesses more credible than Employer's witness.

Per the WCJ, he credited the testimony of Dr. Ridella because Dr. Ridella properly relied on the history provided by Claimant, the results of a physical examination and a bone scan performed in November 2015, and Claimant's physical response to injections made to his thoracic spine. The WCJ determined that Dr. Ridella's diagnosis of compression fractures at the T-3 and T-4 levels was consistent with the medical records, Claimant's subjective complaints, and Claimant's involuntary physical responses which occurred during Dr. Ridella's administration of injections to his thoracic spine.

The WCJ credited the testimony of Dr. Rundorff in part because of his impartiality. Dr. Rundorff examined Claimant at the behest of the long-term disability carrier, as opposed to one of the parties. Dr. Rundorff diagnosed Claimant with compression fractures at the T-3, T-4, and T-12 levels of the spine. Furthermore, Dr. Rundorff performed a comprehensive review of the claim, including a physical examination of Claimant, and a review of his medical records,

including the MRI reports prepared from the November 2012, May 2013, and October 2015 MRIs.

The WCJ specifically discredited Dr. Abraham's testimony because Dr. Abraham was unable to conclude whether or not Claimant sustained a work injury. WCJ Decision, F.F. No. 20. The WCJ also found Dr. Abraham equivocal regarding the findings on the diagnostic studies and whether the findings represented new or preexisting conditions. *Id.*

Employer further argues the testimony of Dr. Shoenthal is incompetent as a matter of law because he never treated or examined Claimant until three years after the injury took place and he never testified an injury even existed. We disagree.

Contrary to Employer's assertions, Dr. Shoenthal, either personally or in consultation with his physician's assistant, Mr. Fetsko, treated Claimant for a variety of ailments since at least 2008. Dr. Shoenthal's opinion was rendered with a full understanding of Claimant's medical history. A medical expert's testimony is unequivocal if, after providing a foundation, the expert testifies he believes or thinks the facts exist. *Bemis v. Workers' Comp. Appeal Bd. (Perkiomen Grille Corp.)*, 35 A.3d 69, 72 (Pa. Cmwlth. 2011). A medical witness must testify, not that the injury or condition might have or possibly came from the assigned cause, but that, in his or her professional opinion, the result in question *did* come from the assigned cause. *Id.* (emphasis added). However, the law does not require every utterance on a medical subject to be certain, positive, and without reservation or exception. *Id.* A medical witness's use of words such as "probably," "likely," and "somewhat" will not render an opinion equivocal so long as the testimony, read in its entirety, is unequivocal and the witness does not recant the opinion or belief first expressed. *Id.*

Here, Dr. Shoenthal never recanted his testimony and, contrary to Employer's assertions, he was unequivocal in his diagnosis as to the cause of Claimant's pain,

15

namely T-3 and T-4 compression fractures. Regarding the cause of Claimant's injury, Dr. Shoenthal testified the back injury "could" have come from the fall. Given that Claimant's x-rays taken **prior** to the September 26, 2012 work incident showed nothing wrong with the thoracic spine, Dr. Shoenthal believed that the work accident and Claimant's subsequent pain "could go together." N.T., 11/24/15, at 21. While use of the word "could" appears to render Dr. Shoenthal's opinion equivocal, a review of the "entire testimony as a whole" does not support such a conclusion. *Bemis*, 35 A.3d at 72 (statement that an action "could have precipitated" an injury did not render testimony equivocal upon review of testimony as a whole). Consequently, we cannot conclude Dr. Shoenthal's testimony was equivocal or incompetent.

The WCJ has complete authority over questions of credibility and evidentiary weight, and those determinations are not subject to appellate review. *Potere v. Workers' Comp. Appeal Bd. (Kemcorp)*, 21 A.3d 684, 690 (Pa. Cmwlth. 2011). We discern no error in the WCJ's credibility determinations. As such, viewing all the evidence in the light most favorable to Claimant as the party who prevailed before the WCJ, *Hoffmaster*, 721 A.2d at 1155, we conclude that substantial evidence exists to support a finding that Claimant suffered a work injury on September 26, 2012 that caused fractures of the thoracic spine at levels T-3 and T-4.

However, we cannot conclude that the WCJ's finding that Claimant's work injury caused a fracture at the T-12 level is supported by substantial evidence. WCJ Decision, F.F. Nos. 18-19. The WCJ made this finding based solely on the opinion of Dr. Rundorff. N.T., 5/6/15, Ex. 2 at 2. The T-12 fracture is described as being fairly distant – about six inches – from the other fractures. N.T., 11/2/15, at 14. Dr. Rundorff notes that the November 2012 MRI report did not describe a compression fracture at any level. *Id.* at 15. The report from the May 2013 MRI described "signal

abnormalities consistent with mild compression fractures at several levels" without specifically indicating a T-12 compression fracture. *Id.* at 16. A careful review of all the medical evidence, combined with the fact that two of Claimant's medical experts did not find a T-12 fracture, does not support a finding of a T-12 fracture.

### *B. Burden of Proof*

Employer next argues the WCJ erred in placing the burden of proof in a claim petition upon Employer. In a claim petition proceeding, the claimant bears the burden of establishing a right to compensation and of proving all necessary elements to support an award. *Rite Aid Corp. v. Workers' Comp. Appeal Bd. (Bennett)*, 709 A.2d 447, 449 (Pa. Cmwlth. 1998).

Our review of the record finds Employer's argument to be without merit. The WCJ granted benefits based on Claimant's testimony. WCJ Decision, F.F. Nos. 17-18. He found Claimant credible as to the occurrence of the injury and the actions Claimant took thereafter (*i.e.*, reporting the injury to his supervisor). *Id.* The WCJ noted that Employer failed to offer any rebuttal evidence. *Id.*

It is clear from the WCJ's decision that he specifically assigned the burden of proof to Claimant and concluded that Claimant met his burden of proof. WCJ Decision at 10. There was no corresponding conclusion that Employer failed to meet its burden. Rather, the WCJ found that Employer did not rebut Claimant's credible testimony that he suffered a work injury and reported the incident to his supervisor.

### Conclusion

After careful review of the record, and applying the pertinent legal standards, we conclude the Board did not err in affirming the WCJ's decision that Claimant suffered a work injury on September 26, 2012 that caused fractures to his thoracic spine at the T-3 and T-4 levels, as those findings are supported by substantial evidence. For the reasons stated above, the WCJ's finding that Claimant also

suffered a fracture at the T-12 level is not supported by substantial evidence. Accordingly, we affirm in part and reverse in part the Board's Order.

_____
ELLEN CEISLER, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

JLG Industries, Inc.,     :
     Petitioner   :
           :
   v.       : No. 1262 C.D. 2017
           :
Workers' Compensation Appeal  :
Board (Mundorff),     :
     Respondent  :

**O R D E R**

AND NOW, this 18th day of April, 2018, the Order of the Workers' Compensation Appeal Board (Board), dated August 24, 2017, is hereby affirmed in part and reversed in part. To the extent the Board affirmed the finding of the Workers' Compensation Judge that Matthew Mundorff suffered a work injury that caused a fracture to his thoracic spine at the T-12 level, we reverse. In all other respects, we affirm.

          _____
          ELLEN CEISLER, Judge